CITY OF KANSAS CITY v. PUBLIC SERVICE COMMISSION et al; KANSAS CITY RAILWAYS COMPANY, Appellant.

In Banc, January 14, 1919.

1. **STREET CAR FARES: Power of Legislature to Change Contract Rates.** Section 20 of Article 12 of the Constitution does not vest full power in a city to regulate street-car fares within its limits, nor does it interfere with the Legislature's power to exercise the police power· to change such rates in a case in which the facts are· such as to call for alteration.

2. ———: **Confiscation of Properties.** Where the street-car company expressly states that it asks no increase in fares for the purpose of paying anything except operating expenses and fixed charges, there is no question of confiscation in the case.

3. ———: **Reviewable by State Commission.** Street-car rates fixed by city franchise and contract are reviewable by state agencies in the exercise of the police power to regulate rates.

4. ———: **Statutory Power to Raise Rates.** The statute (Laws 1913, p. 583, sec. 47) empowers the Public Service Commission to raise rates fixed by city franchise and contract.

5. ———: **Interest Charges.** Interest on the mortgage indebtedness of the street railway company, when the agreed five-cent fare does not yield enough revenue to meet it, was not deferred under the "cumulative" section of the franchise in this case, but under the sections concerning mortgages the interest payments were enforceable; and consequently, a showing that the company, after paying operating expenses and fixed charges, would still face a large total deficit, presents a case for the exercise by the Public Service Commission of the power to increase the rates.

6. ———: **Wage Increase.** The facts of this case demonstrate that an increase in the wages of conductors and motormen of the

street railway of one cent an hour for each employee who re-
ceived less than $1800 per year was reasonable, and necessary to
a proper operation of the railway system.

7. ————: Interstate System: Power of State to Regulate. The inter-
state-commerce clause of the United States Constitution does not
inhibit the State from regulating intra-state fares to be charged
by a street railway company whose system embraces a city in
this State and one which is situate just over the border line in
another State, provided no direct burden is laid upon interstate
commerce.

8. POLICY OF LAW. The courts have no power or right to say
what the law ought to be. They have nothing to do with the
policy of a constitutional law.

Appeal from Cole Circuit Court.—*Hon. J. G. Slate,*
Judge.

REVERSED AND REMANDED.

*A. Z. Patterson* and *J. D. Lindsay* for appellant,
Public Service Commission; *Clyde Taylor* for appellant,
Kansas City Railways Co; *Frank Hagerman* and *R. J.
Higgins* of counsel.

(1) The continuous, successful operation of public
utilities—particularly street car transportation—dur-
ing the war crisis is greatly important, not only to
state and city, but to the nation, as evidenced by de-
clarations of the nation's highest officials. (2) The
power to regulate street railway rates is expressly
given to the Commission, without reservation or ex-
ception. State ex rel. v. Pub. Serv. Com., 259 Mo.
728. (3) The power to regulate public utility rates
is a branch of the sovereign police power of the State.
Such power has not been abridged, and the State,
acting throught the Public Service Commission, has
the right to alter such rates, notwithstanding any ordi-
nance provisions, and notwithstanding the provisions
of Section 20 of Article 12 of the Constitution, or other
law. (a) The power to regulate these rates is an
exercise of the police power of the State. State ex rel.
Sedalia v. Pub. Serv. Com., 275 Mo. 201; State ex

rel. Fulton v. Pub. Serv. Com., 275 Mo. 67. (b) The decisions all hold that no city shall be held to have power to suspend the authority of the State to regulate rates (i. e., exercise police power) unless the State has expressly, or by the very clearest implication, granted such power to the city. The state power to regulate is police power, and it is never held to be surrendered where the question is debatable. Milwaukee Elec. Ry. v. Wisconsin Railroad Com., 238 U. S. 179; Home Telephone Co. v. Los Angeles, 211 U. S. 273, 58 L. A. 176; Puget Sound Co. v. Reynolds, 37 Sup. Ct. Rep. 705. (c) Section 20, Article 12, of the Constitution of Missouri does not either expressly, or by such clear implication as to put the matter beyond dispute, delegate to cities authority to contract away the police power of the State to regulate fares. State ex rel. Sedalia v. Pub. Serv. Com., 275 Mo. 201. (d) The Sedalia and Fulton cases make no exception with respect to street car companies from the general rules announced therein. (e) The great weight of authority in other states sustains the propositions that, even where there is a constitutional provision such as Section 20, of Article 12, of the Missouri Constitution, the State may exercise police power to change street car rates imposed by franchises. Atlantic Coast Electric Ry. Co. v. Board of Public Utility Commrs., 104 Atl. 218; State Public Utilities Com. v. Railroad, 275 Ill. 570; Chicago v. O'Connell, 278 Ill. 591; Woodburn v. Pub. Serv. Com., 161 Pac. 391.

*E. M. Harber*, City Counselor, *M. A. Fyke* and *E. F. Halstead*, Assistant City Counselors, for respondent.

(1) At the time of the making of the franchise contract between respondent city and appellant railways company it was the settled law of this State, never since from any source until quite recently questioned, and so far as we know never questioned by this court, that the parties to said franchise contract had the right to make same. That the city could, without the con-

sent or interference from any source whatever, determine under the provisions of Section 20, Art. 12, of the Constitution of this State, upon what terms or conditions, if at all, it would permit the use of its streets for a great, or any number of years to be occupied and used by a street railroad, and upon such terms and conditions imposed by the city being accepted become valid and binding upon each of the parties thereto, and could only be changed or modified by consent of both. Hovelman v. Ry. Co., 79 Mo. 632; Faith v. Railroad, 105 Mo. 548; Railway v. Railway, 105 Mo. 571; State ex rel. Subway Co. v. St. Louis, 145 Mo. 551; Railway Co. v. Railway Co., 148 Mo. 645; State ex inf. v. Railway Co., 151 Mo. 183; Railway v. Kirkwood, 159 Mo. 252; National Subway Co. v. St. Louis, 169 Mo. 319; Kansas City v. Ry., 187 Mo. 155; Railway v. Railway, 190 Mo. 256; St. Louis v. Railway, 263 Mo. 439. The rule is general, without exception, that where a muncipality has the power to refuse the use of its streets to a public service company, the power to impose conditions, prescribe rates for such use, is vested in such municiaplity. Noblesville v. Gas Co., 157 Ind. 162; Shreveport Trac tion Co. v. Shreveport, 122 La. 147; City of Kala mazoo v. Kalamazoo Circuit Judge, 166 N. W. (Mich.) 998; Simons v. Tel. Co. 99 Md.141, 63 L. R. A. 727; Murphy v. St. Railway, 199 Mass. 279; New Orleans Gas Co. v. New Orleans, 115 U. S. 650; Freeport Water Co. v. Freeport, 180 U. S. 587; Cleveland v. Cleveland City Ry. Co., 194 U. S. 517; Vicksburg v. Vicksburg Water Co., 206 U. S. 496; Cleveland v. Cleveland Elec. Ry., 201 U. S. 529; Home Tel. Co. v. Los Angeles, 211 U. S. 265; Louisville v. Tel. Co., 224 U. S. 649; Detroit United Ry. v. Detroit, 229 U. S. 39; McChord v. Railway Cos., 183 U. S. 483; Boerth v. Detroit, 152 Mich. 657; Muncie Gas Co. v. Muncie, 160 Ind. 97, 60 L. R. A. 822; Railroad v. Baltimore, 21 Md. 93; Pringree v. Mich. C. R. Co., 118 Mich. 314, 53 L. R. A. 274; Bessemer v. Water Co., 152 Ala. 391; Newark v. Gas Co., 65 Ohio, 210; Gas Co. v. Mendenhall, 142 Ind.

538; Richmond v. Indiana, 168 Ind 82. Where such power is given by the paramount law, the state constitution, to municipalities to consent or not consent to the use of its streets by street railroad companies, as by the constitution of this State, Pennsylvania, New York, South Dakota, then such municipalities have ample and full power to impose conditions as to rates, and this too without the consent or interference or authority of the Legislature in any way, and upon such condition being accepted by street railroad company, it becomes a valid and binding contract which cannot be changed, abrogated or in any wise interfered with, except by the parties thereto, the very purpose of such provision in the Constitution being to put an end to the Legislature's interference, the power to grant or refuse such consent, being a "gift directly from the Constitution, needs no help or permits any interference from the Legislature." Allegheny v. St. Ry. Co., 159 Pa. 411; Plymouth v. R. R. Co., 168 Pa. 181; West Chester Borough v. Tel. Co., 227 Pa. 384; People v. O'Brien, 111 N. Y. 1; Kittinger v. Traction Co., 160 N. Y. 377; City v. Tel. Co., 25 S. D. 409; City v. Tel. Exchange Co., 189 Fed. 289; Motor Co. v. City of Omaha, 147 Fed. 1; City v. Bovre & M. Tr. Power Co., 88 Vt. 304; Tel. Co. v. Commonwealth, 161 Ky. 543. Where, as here by the fundamental law, the Constitution, municipalities have been given the exclusive power to say whether or not a street railroad company shall occupy their streets, we most earnestly insist, being justified in such insistence not only by the frequent, timely and unanswerable utterances of this court, but substantially all others, that such sole power granted to muncipalities necessarily carries with it the right to fix, and this too without any interference from any other source whatsoever, the rate of fare to be charged by such street railroad for the privilege thus granted. McCullough v. Maryland, 17 U. S. 421; Detroit v. Detroit Citizens Ry., 184 U. S. 368; Milville v. St. Ry., 159 Pa. 411; Philadelphia v. R. R. Co., 143 Pa. 444; Plymouth Tp.

v. Railway, 168 Pa. 181; Philadelphia v. Railway, 177
Pa. 382; West Chester Borough v. Tel. Co., 227 Pa.
384; People v. O'Brien, 111 N. Y. 1; Kittinger v.
Traction Co., 160 N. Y. 377; City v. Tel. Co., 25 S.
D. 409; City v. Tel. Exchange Co., 189 Fed. 289. As
to the authority of city to impose conditions, where
the right is given to it by constitution or statute to
grant or deny the use of its streets, the rule is sub-
santially universal that in the granting of such right
the city has the power to impose such condition as it
sees fit. Railroad v. Leavenworth, 1 Dillon, 393; Com-
mission v. Water Co., 70 N. J. Eq. 71; Mager v.
Grima, 8 How. (49 U. S.) 400; Pasadena v. Terminal
Co., 109 Cal. 315; Sutherland on Statutory Construc-
tion, sec. 391; Beach on Public Corporations, sec. 1314;
2 Lewis' Sutherland Statutory Construction, secs. 508,
510, 511; Thorp on Public Officers, sec. 1342; State
v. Railroad, 242 Mo. 355; State ex rel. v. Roach, 267
Mo. 316; Tranbarger v. Railroad, 250 Mo. 55; People
v. Gillison, 109 N. Y. 389; Whitley v. Terry, 82 N. Y.
Supp. 89; Gas Co. v. La. Co., 115 U. S. 661. (2) The
respondent city in entering into contract here was
exercising its proprietary power, in pursuance of the
power conferred upon it by the Constitution and its
charter. The exercise of such powers is not subject
to be destroyed by the police power of the State. State
ex rel. Subway v. St. Louis, 145 Mo. 551; State v.
Roach, 267 Mo. 316; Tranbarger v. Railway, 250 Mo.
46, 55; State ex rel. St. Louis v. Gas Co., 102 Mo. 472.
(3) When at the time a contract is made the same is
valid by the laws of the State, as then expounded by
the departments of the governments and administered
in its courts of justice, its validity and obligations can-
not be impaired by any subsequent, even constitutional,
ordinance, act of the Legislature or decisions of the
courts. State v. Miller, 50 Mo. 133; Hunter v. Pitts-
burgh, 207 U. S. 179; Newburyport Water Co. v. New-
buryport, 193 U. S. 561; Los Angeles v. Los Angeles
City Water Co., 177 U. S. 558; Harmon v. Auditor,
123 Ill. 135; Marshall v. Selliman, 61 Ill. 221; Ohio

Life Ins. and Trust Co. v. DeBott, 57 U. S. 429. (4)
The State cannot by virtue of the police power, re-
scind, modify or deprive the city of the benefits ac-
cruing to it, under its contract with the street railway
company. Secs. 25, 26, 53, Art. 4, Constitution; Secs.
2, 4, 5, Art. 12, Constitution; State v. Bishop, 128
Mo. 373; State ex inf. v. Ins. Co., 150 Mo. 113; Ham-
mon v. Coal Co., 156 Mo. 232; State v. Webber, 214
Mo. 272; State v. Searcy, 20 Mo. 491; State ex rel.
v. Roach, 267 Mo. 216; State ex rel. v. Laclede Gas
Co., 130 Mo. 10; People v. Gillson, 109 N. Y. 389.
(5) No authority is given or intended to be given by
the Public Service Act of this State to permit the
Public Service Commission to change contract rates.
It is only where "rates of fare have heretofore been
authorized by statute," not contract, that the Public
Service Commission is authorized to change same.
Public Service Commission Act, sec. 47, p. 583; Quinby
v. Public Service Commission, 119 N. E. R. 433; State
ex rel. Tacoma R. & P. Co. v. Public Service Commis-
sion, 172 Pac. 890. The Public Service Commission
being a mere creature of the statute, can only exercise
such powers as are expressly conferred on it. Nothing
should be left to inference or seek refuge in implica-
tion or the exercise of a discretion. United Railways
Company v. Public Service Commission, 270 Mo. 442.
(6) Even if power exists in the Public Service Com-
mission to increase or change the rate of fare, the
facts do not disclose such urgent emergency as to
justify any increase, especially in view of Section, 27,
Clause 2, of the franchise contract. Certainly no
authority is given, attempted to or could be given,
Public Service Commission to increase rates of fare
for benefit of mortgage holders, in violation of fran-
chise-contract agreed to by them and contained in
each and every of said mortgages.

BLAIR, J.—This case involves the validity of
the order of the Public Service Commission increasing
street-car fare in Kansas City to six cents. The order

was made June 22, 1918; was reversed by the circuit court of Cole County September 7, 1918, and a special order granting an appeal to this court was made by the Chief Justice on the same day. The cause on appeal was argued and submitted November 11, 1918.

The Kansas City Railways Company operates the street-car system in the two Kansas Cities, Missouri and Kansas. Its petition to the Public Service Commission sets up that the company's franchise requires (1) public service and (2) a six per cent return upon an agreed valuation; that it was "prepared with care upon correct tables of the average reasonable expense and revenue on the basis of a five-cent fare;" that from such revenue under normal conditions the property is reasonably certain to pay all necessary expenses, give all needful service, pay the six-per-cent return out of which bonded interest would be met, and yield a surplus; that operation under the franchise for three years from July, 1914, paid expenses and interest and yielded a surplus of $400,000 per annum which inured to the city's benefit; that the result of the nation's entry into the war changed conditions radically and largely increased expenses to such an extent as to endanger the property and the rights of the public under the franchise. Details of increases are set forth. Increases in cost of labor, oil, coal, and interest and taxes are specified. It is alleged other increases will result and that none of these could have been in contemplation when the franchise was drawn, ratified and accepted; that a five-cent fare, while these abnormal conditions exist, will not yield revenue adequate to give "the city and those interested the full advantages of the franchise provisions of an up-to-date street railway system in a rapidly and constantly growing community, make additions and improvements called for, allow the company to earn, at the legal rate, interest upon the money invested, and meet the general demands, not of a franchise nature, for contributions for or towards public improvements and undertakings. "After return to anything like pre-war normal con-

ditions it again will be possible to carry out the entire spirit of the franchise with the passenger revenue based upon that fare. The relief now sought is therefore temporary in nature, to continue so long as the Commission shall determine to be necessary to meet the abnormal situation.''

The prayer is for such increase of fare as may be fair and just in view of the changed conditions. This sufficiently epitomizes the petition.

The answer of the city need not be set out. It sufficed to raise all questions now presented, and particular averments will be referred to as occasion demands in the course of the opinion.

Considerable evidence was offered. The whole financial history of the company since the adoption of the franchise in 1914 was laid before the Commission. Estimates of operating expenses for the last nine months of 1918 were made. Some differences as to amounts expended and as to receipts and probable receipts appear. After an examination of the record and briefs and the opinion of the Public Service Commission we are of the opinion the Commission's findings on these questions are correct. Those findings sufficiently appear in the opinion which follows.

After finding the facts, the Public Service Commission, speaking generally, held: (1) it had power to raise street-car fare in Kansas City, despite the franchise provisions and certain constitutional provisions relied upon by the city; and (2) that the facts made a case which called for the exercise of that power.

The Commission ordered (1) that the plea to the jurisdiction be overruled; (2) that the company might charge a six-cent fare from July 15, 1918, to July 15, 1919, and then should restore the five-cent rate—subject to the Commission's power to terminate or extend this order; (3) that certain books of fares be placed on sale, and (4) that monthly reports of income and expenditures should be made to the Commission. The Commission retained full jurisdiction of the whole matter for the purposes of supervision and modification

of its order as justice might require. This sufficiently states the order for present purposes.

On writ of review to the circuit court the order was reversed. On the granting of the appeal here conditions imposed required the segregation and repayment of the increase in the fare in case of affirmance, and payment to the company in case the judgment was reversed and the order of the Commission allowed to stand.

I. The city's first contention is that Section 20, Article 12, of the State Constitution vests full power in the city to regulate street car rates within its limits and devests the legislature and its agencies of all right to interfere. That question was pre-

Power of City.

sented in the case of the City of St. Louis v. Public Service Com., *ante* p. 509, argued here on the same day this case was argued. After full consideration of the briefs and arguments of counsel in both these cases this court in that case held Section 20 had no such meaning as contended for by the cities and constituted no obstacle to the exercise of authority under the police power to change rates in a case in which the facts were such as to call for the exertion of such power. To that conclusion we adhere.

II. There is no question of confiscation in this case. Whether such question could be raised under a franchise like that before us is, therefore, not an issue.

Confiscation.

The company expressly states it asks no increase for the purpose of paying anything except operating expenses and fixed charges.

III. The question whether rates fixed by franchise and contract are revisable by state agencies in the exercise of the police power to regulate rates has been settled by recent decisions of this court (State v. Public Service Commission, 204 S. W. 497; City of Fulton v. Public Service Commission, 204 S. W. 386; Kansas City Bolt & Nut Company v. Kansas City Light, Heat & Power Co., 204 S. W. 1074; City of St.

Louis v. Pub. Serv. Co., reported at page 509 of this Report, and we are satisfied with the principles therein announced. Those principles answer the contention that a franchise or contract rate is, by the fact of being such a rate, put beyond the reach of the exercise of the constitutional power vested in the Legislature and its agencies to regulate. rates. That portion of the argument devoted to these questions need not be further considered.

IV. It is urged that the statute (sec. 47, p. 583, Laws 1913) does not empower the Public Service Commission to raise rates fixed by franchise agreement. This contention rests solely upon the statute. Whether the Commission could raise such rates for the mere purpose of securing to the utility a difference between what it received under the franchise rate and a reasonable return upon its investment is not involved in this case. Under this statute we have held that the Commission may permit a carrier to charge a rate higher than that fixed by statute. [State ex rel. v. Public Service Commission, 259 Mo. 704; State ex rel v. Public Service Commission, 270 Mo. 1. c. 562.] The principal ground upon which this ruling was put was that any other construction would render the act "shocking in its inequities and unfairness;" that to empower the Commission to control expenditures necessarily precluded the theory that it "was denied control of the income." At most, in chosing between two meanings of not entirely unambiguous language, reason requires that to be chosen which will not render the act absurd and unenforceable in practice. That principle requires the same conclusion in this case as was reached in the cases cited. Those cases have been re-examined in the light of the briefs and arguments now before us, and we find nothing which justifies a view that they are incorrect in their construction of the law.

The Commission is authorized to enforce orders for operation of the system in such manner as to render adequate service. That this cannot be done without in-

come sufficient to pay operating expenses and fixed charges is apparent, without reference to the manner in which the indequate rate is fixed.

It was a matter of common knowledge that franchise street-car rates existed pretty generally. The Legislature passed the act in view of this situation. The construction urged by the city would render the act somewhat absurd and partially unenforceable. The more reasonable and natural construction is that given by the Commission and by this court in analogous cases. It is settled law that in such circumstances that meaning must be adopted which will not attribute absurdity to the Legislature and which will give the act its natural force.

V.  The city insists that the facts do not, in view of the peculiar franchise provisions, present a case for the exercise of the power to raise rates, even though it be conceded such power resides in the Public Service Commission.

This makes it necessary to set out the facts developed in so far as they are relevant to the question the city raises. The contention is that the revenue produced by the five-cent fare is shown to be sufficient to pay all expenses and charges unconditionally payable under the franchise and will leave a balance of several hundred thousand dollars available to meet the expenditures asserted by the company and found by the Commission to be necessary to preserve the property and render adequate service. If the city is right in this contention, the order, in the state of this record, is wrong without regard to any question of the reasonableness of the return, if any, the company would receive out of the revenue for the period covered by the order. We say this because the company expressly disclaims that it asks or wishes any increase in rates for the purpose of payment to it of any sum in excess of an amount equal to the sums it is required to pay and must pay out under the terms of the franchise and the mortgages securing

*Interest Payments.*

the authorized and existing bonded indebtedness and those necessary to preserve the property and render adequate service. The real question presented by the city's contention is whether interest on the mortgage indebtedness of the company is, when the franchise fare does not yield revenue sufficient to meet it, deferred under what the parties term the "cumulative" section of the franchise. The Commission's findings are very nearly in accord with the city's contention in respect of the particular facts relevant to the question raised.

Treating interest on mortgages as a fixed charge, the company estimates the total deficit for the calendar year of 1918 at $1,034,499.37. The city offered an estimate of $992,254, and made an estimate in its brief of $853,787.17, and another of $820,295.81. The Commission's estimate is $860,564.99. The Commission finds that $739,000 of this is assignable to Missouri business and $648,546.00 to Missouri intrastate business. The Commission proceeds, with a wealth of detail, to discuss the whole of the evidence on the question. It tabulates the whole income and all expenditures since the adoption of the franchise, and discusses at length the contention of the' parties with respect to the various items. We think it unnecessary to set out the whole of this since the same legal result will flow from the adoption of any one of the estimates, as will presently appear. We are satisfied with the accuracy of the Commission's estimate. We do not understand that its correctness in any important particular is seriously assailed as being unsupported by the preponderance of the evidence. In considering this deficit it is necessary to keep in mind that it takes no account of increased wages or of contingencies.

The Commission found that the "bond interest" for the calender year of 1918 would amount to $1,731,920. The city contends the payment of this interest is deferred by the "cumulative" section until such time as the revenue from the five-cent fare becomes again sufficient to pay it after paying other charges which cannot be deferred. If this contention

is correct, and the deficit, including such interest, is only $860,564.99, then, the interest payments being deferred, the company would have in hand about the difference between the total interest and the total estimated deficit as estimated on the basis stated, or approximately $900,000, with which to meet wage increases, contingencies, etc. The Commission finds this sum to be $901,053.84. The city estimates it at $907,831.65. Of its estimate the Commission finds $680,057.77 to be assignable to Missouri intrastate business.

The franchise was submitted to and adopted by the people of Kansas City and formally accepted by the company. It constituted a settlement of controversies which had long existed. It fixed the total value at something over $35,000,000 for the whole property in both Kansas and Missouri. The mortgage indebtedness was over $28,000,000, and the balance (about $6,148,000) represented what are called intangibles. It provided for a five-cent fare. Section 27 provides for payment, in order, of:

"1. All expenses of management and operation, including all expenditures needful and necessary, to put, keep and maintain the property, and every part thereof, in first-class condition, and provide for the public first-class modern street car service.

"All taxes, license fees, or public charges and special assessments of every kind and character, including all public charges upon or for earnings, or incomes.

"2.  .  .  .  To the company, an amount equal to six per cent per annum, cumulative, payable semi-annually, upon the amount of the capital value from time to time determined and certified as herein provided. By the word 'cumulative' is meant that if the earnings for any six months are not sufficient to pay at such rate of six per cent, then such deficiency with interest thereon at the rate of six per cent shall be paid from future earnings, if any, when made.

"3. All liabilities for personal damages and injuries," etc.

Section 27 further provides for the amortization of the $6,148,000 intangible value out of surplus and for the division, after amortization is complete, of the surplus between the city and company. Methods by which the city might acquire the property were provided.

The question now raised by the city is based upon these and the following franchise provisions:

"Sec. 1. The obligation of the company to the city created by this ordinance shall be the first and paramount obligation of the company prior and superior to any other obligation, lien or right upon or against any of its property or the earnings thereof."

(Here appears Section 27, quoted above).

Section 30 (p. 35); "Any and every mortgage shall conform and be subject to the provisions of this ordinance."

Same section, p. 36: "Every mortgage executed by the company must be expressly made subject to the terms and provisions of this ordinance, and must, before the same shall be valid, be approved by the city counselor in writing endorsed thereon."

Same section, same page: "If such mortgage conforms, and is expressly made subject, to the terms of this ordinance, it shall be mandatory upon the city counselor to approve the same."

Section 27, page 33: "All the terms, conditions and covenants in this contract contained, shall be construed as covenants running with the property in whatsoever manner the same may be mortgaged, sold, transferred or conveyed."

In this connection the additional abstract states that at the time the property was taken out of the court of bankruptcy Judge Hook promulgated an order or plan of reorganization by the express terms of which "the present outstanding bonds and mortgages above referred to are expressly made subject to the terms, conditions and covenants contained in the franchise."

The franchise conditions and covenants run with the property. Every mortgage is expressly required

to be made, and is made, subject to them. Such mortgages were in contemplation as a part of the reorganization and franchise scheme. The city contends that by reason of these facts the "cumulative" provision in the franchise (Sec. 27) thereby becomes one of the conditions and provisions of the mortgages and has the same effect upon the interest payments under the mortgages that it has upon the payment of the six per cent upon the total capital valuation as specifically provided in the "cumulative" section, i. e., that such interest payments (the contention is) are not enforceable, but are deferred in case the net income payable to the company under the six per cent franchise "cumulative" section is insufficient to enable the company to meet such interest payments as they fall due. Such we understand the position of the city to be.

It is not contended there is any clause in either the franchise or mortgages which expressly provides for deferring mortgage interest payments in any case. The argument is, in effect, that the quoted franchise provisions justify and require the conclusion that counsel draw that the "cumulative" section which expressly refers only to the company's six per cent return, applies to and, in like circumstances, defers mortgage interest payments.

This position we do not think tenable. The franchise sets out in great detail the rights and interests of the city and the company. The city is given the right to purchase the property and the right to a substantial participation in the income above operating expenses, fixed charges and the return allowed the company. The city thus acquired a valuable interest. The franchise was drawn with a view to the protection of the rights of all concerned. The "cumulative" section makes no specific reference to anything save the six per cent income payable to the company on the agreed capital value. Its *terms* do not include anything else. It does not, either expressly or by necessary implication, refer to mortgage interest. The mortgages, it is not

disputed, expressly provide for the payment of interest at a stated per cent on fixed dates. The general rule is that words must be construed according to their plain and ordinary meaning. Such a construction in this instance defeats the city's contention. Is there reason to think the case requires, in order to reach the real meaning of the parties, some other construction of the clauses in question? To give the mortgage interest provisions their plain and natural meaning in no wise affects the company's or the city's rights under the "cumulative" section referred to or under any part of the franchise. It may be that if these interest payments fall due and are not met foreclosure proceedings will result, but such foreclosure cannot affect the city's rights, since the purchaser could acquire nothing save the company's interest. The franchise and the mortgages provide that the city's rights under the franchise cannot be affected by foreclosure and that the purchaser must take subject to all of them.

The protection of the city's interest under the franchise was doubtless the object of making the mortgages subject to the franchise. It is the company's interest only which is covered by the mortgage. It thus appears there was ample reason for making the mortgages subject to the franchise without our construing the cumulative section as urged by the city. In other words, there is no need of our giving the words of the franchise an unusual meaning in order to find some reason for requiring the mortgages to be made subject to the franchise provisions. The franchise discloses ample reason for the incorporation of that requirement independently of the cumulative section. Therefore, any argument that mortgage interest payments must be held to be deferrable under the cumulative section or that the provision making the mortgages subject to the franchise has nothing upon which it can operate, is unsound.

Again, it is not contended the language of either the "cumulative" section or of the mortgages is ambiguous. On the contrary, it is plain and unequivocal. Very

clearly the mortgages are made subject to the franchise. Just as clearly they provide for the payment of interest at fixed times. The cumulative section plainly provides for deferring, in given circumstances, the six per cent payments on capital value to the company. Just as plainly it entirely omits to make any such provision respecting mortgage interest payments. This franchise was the result of long and careful deliberation on the part of all concerned. Mortgages were in contemplation of all. There is nothing mysterious or complicated in the term mortgage. All parties must have known that when such an instrument provided in terms for interest payments on given dates those payments would become due regardless of the ability of the mortgagor to meet them—unless provision to the contrary was made. Is it conceivable that the framers of the franchise, had their intent been as the city contends, would have left such a vital matter to inference and argument from franchise provisions making no direct reference thereto but, in fact, in their ordinary meaning excluding such an idea? An affirmative answer would tend to impeach the soundness of judgment of all concerned.

Further, it is to be remembered the parties were engaged in launching a great public utility into new franchise waters. All were aware that one important feature was that a great deal of money be secured by mortgages on the company's interest in the property. It was the concern of both city and company to secure a low interest rate. The construction now given the "cumulative" section by the city would necessarily imply that the framers of the franchise intended that the security offered mortgagees should be one so hedged about that, under conceivable conditions, interest might not be paid for years and, possibly not at all.

Another consideration is this: In case conditions arose, as they very conceivably might, such that the five-cent rate during the life of the franchise, would not, according to the franchise provisions, be sufficient to raise sufficient revenue to pay the company the whole

of the six per cent per annum upon agreed capital value, could the company enforce its claims for such deficit? Against what interest would it enforce it? And if this is a condition of the company's right to *income,* does it, under the city's argument, become a condition of the right of the mortgagees to *interest* and even to their principal? The city's argument is that all the conditions of the "cumulative" section are conditions of the mortgages. It seems to us the argument proves too much, and therefore proves nothing.

We are driven to the conclusion that the mortgage interest payments become due and payable according to their plain language and are unaffected by the "cumulative" section.

It results that on the undisputed facts the case made before the Commission showed that, after paying operating expenses and fixed charges falling due during the year, the company would face a total deficit of approximately $850,000 and a deficit of $648,546 on Missouri intrastate business.

Regardless, therefore, of the question of wage increase and contingencies and of any net return to the company on its interest, the system faced foreclosure and bankruptcy.

VI. It was shown that a wage increase was necessary to a continuance of proper operation of the system. It appeared without dispute that common labor in the community was paid a much higher wage than the company's motormen and conductors; that some had left and others were about to leave the service of the company on account of the insufficiency of their pay to meet living conditions; that they were going to other employment where larger wages were paid and that this was resulting more and more in affecting the service injuriously. It was shown that an increase of one cent an hour for each employee who received less than $1800 per annum would add $105,000 to the year's wage expense. It also appeared that the average wage previously paid (1917) motormen and conductors was about thirty and one-

half cents per hour and that common labor was being paid, by some large employers, at the rate of forty cents an hour. We do not find that the city contends a wage raise is unnecessary, not essential to the proper manning of the cars for adequate service. That contention of the company and finding of the Commission do not seem to be questioned. On this record we conclude the finding was correct.

The insistence of the city that the deferring of interest payments would leave large funds in the company's hands was doubtless deemed by the city sufficient on this point. With that position we have already dealt.

VII. The suggestion that the interstate-commerce clause of the Federal Constitution invalidates the order Interstate of the Commission is sufficiently met by Commerce. Simpson v. Shepard (The Minnesota rate cases), 230 U. S. 352. In that case the right of the State to regulate intra-state rates, provided no direct burden was laid upon interstate commerce, was given full recognition. The Public Service Commission followed the rule in that case with respect to separate value of the intra-state property and income.

VIII. A portion of the brief is devoted to what we take to be an argument as to the policy of the law. With the question what the law ought to be we have no power or right to speak in this case. Our sole Policy function is to declare what the applicable law of Law. is. We must take the law as it is and the facts as they are and apply the one to the other and announce our conclusion. This is our sole function under the Constitution. It is the only commission given us. Whether we differ from or agree with the policy of a constitutional provision of our law is of no moment in the performance of judicial duty.

The conclusions reached require a reversal of the judgment of the circuit court of Cole County and a remandment of the cause to that court with directions to set aside its judgment in this case and affirm the order of the Public Service Commission. It is so ordered.

All concur.