(No. 13105.—Judgment reversed; order of Public Utilities Commission affirmed.)

THE CHICAGO RAILWAYS COMPANY *et al.* Appellants, *vs.* THE CITY OF CHICAGO, Appellee.

*Opinion filed February 18, 1920—Rehearing denied April 9, 1920.*

1. PUBLIC UTILITIES—*when a judgment setting aside order of commission is appealable.* If, on the petition of street railway companies for increased fares because of increased wages and operating expenses, the order of the Public Utilities Commission finds that the petitioners are furnishing service for less than cost and authorizes a temporary·schedule of increased fares until a further hearing is had to establish permanent rates, a judgment of the circuit court setting aside the order for the temporary increase in fares disposes of a definite branch of the controversy and is appealable.

2. SAME—*when city may appeal from order authorizing temporary increase in fares of street railways.* An order of the Public Utilities Commission authorizing street railway companies operating in a city to put into effect a temporary schedule of increased fares may be appealed from by the city, where it has a contract with the railway companies as to the rates of fare and it has received notice of the hearing and appeared before the commission and contested the order.

3. SAME—*contract as to rates of fare is subject to legislative control.* By the statutory provision enacted pursuant to section 4 of article 11 of the constitution, that cities may grant the right to a street railway company to operate for twenty years, the legislature has not divested itself of its control over a contract as to rates of fare although the contract creates a partnership between the company and the city by which the city shares in the income from the rate fixed, and the intervention of the State, either on behalf of the utility to secure a reasonable return for the service rendered or of the city to reduce rates which have become excessive, does not abrogate such a contract. (*Public Utilities·Com.* v. *City of Quincy,* 290 Ill. 360, followed.)

4. SAME—*the "Mueller law" does not affect legislative control over rates of fare.* There is nothing in the so-called "Mueller law," authorizing cities to acquire street railways, which either directly or by inference affects the power of the General Assembly to regulate rates of fare, and a contract between the city and street railway companies is subject to legislative control although it has been entered into under said statute and gives the city a share in the income from rates fixed by the contract to enable it to purchase the property of the companies.

5. SAME—*cvery citizen of the State has equal right to use of streets of a city.* A municipality is a mere agency of the State, and, whether invested with the fee or a mere easement in streets, it holds them in trust for the people of the State, who have an equal right to the use of the streets for street purposes and are represented not alone by the city but by the General Assembly.

6. SAME—*legislature is bound to see that rates of fare in use of streets are reasonable.* The General Assembly has the power and is charged with the duty to see that rates of fare in the use of streets of a city are reasonable, within the limit of a fair return to the railway company and reasonable compensation for the service rendered; and the interest of the city cannot affect the exercise of that power and duty, as the question of rates of fare is not one merely of local concern.

7. SAME—*commission has power to fix a temporary rate until further hearing to determine a permanent rate.* Under section 36 of the Public Utilities act the commission is authorized to provide for an emergency by making an order for a temporary rate to meet an existing condition, limited to the time required for making an investigation and finding what a permanent rate should be.

8. SAME—*when former adjudication of commission is not controlling.* Where it is shown, on the application of street railway companies for increased rates of fare, that a temporary increase is necessary to meet increased operating expenses due to the increased wages allowed after a strike of the employees, a former adjudication of the Public Utilities Commission that the existing rate is reasonable and proper is not a determination of what would be a reasonable rate under the changed conditions.

DUNCAN, J., dissenting.

APPEAL from the Circuit Court of Sangamon county; the Hon. E. S. SMITH, Judge, presiding.

W. W. GURLEY, JAMES M. SHEEAN, and ARTHUR DYRENFORTH, (HARRY P. WEBER, C. F. MORTIMER, and SIDNEY S. BREESE, of counsel,) for appellants.

SAMUEL A. ETTELSON, Corporation Counsel, (GEORGE B. GILLESPIE, DANIEL A. ROBERTS, and CHESTER E. CLEVELAND, of counsel,) for appellee.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

On August 2, 1919, the Chicago Railways Company, the Chicago City Railway Company, the Calumet and South Chicago Railway Company and the Southern Street Railway Company, operating the street railway system in the city of Chicago under the designation of Chicago Surface Lines, filed a petition to the State Public Utilities Commission setting forth that at a meeting on July 11, 1919, members of Division No. 241 of the Amalgamated Association of Street and Electric Railway Employees of America, to which practically all of the trainmen and most of the other employees of the petitioners belonged, approximating 10,500 men, demanded a wage increase, which was presented to the petitioners on July 12, 1919, increasing the pay of trainmen from forty-eight cents to eighty-five cents per hour, with a corresponding increase to other employees, to be effective June 1, 1919, fixing a work day of all employees at eight hours, with time and a half for overtime, a six-day week and other new conditions of the service; that the petitioners were unable with the existing rate of fare to meet any demand for an increase of operating expenses, but after negotiations made an offer to increase the wages of trainmen from forty-eight cents per hour to sixty-five cents per hour, with a like increase of seventeen cents per hour to all other employees, fixing an eight-hour day and with other conditions increasing operating expenses, conditioned upon the granting by the commission of an increase in fares concurrently with the taking effect of the wage increase; that the offer was rejected on Monday evening, July 28, and a strike was called for four o'clock Tuesday morning, July 29; that on July 30 the officials of Division 241 decided to submit the proposition of the petitioners to a referendum vote to be taken on Friday, August 1, and as a result of the vote the proposition was carried and operation of cars was resumed on Saturday, August 2, and that the new wage

scale was to become effective at midnight of Tuesday, August 5. The petitioners represented to the commission that they could not meet the wage increase without an increase of fares, and prayed for (1) an order increasing fares to meet the existing emergency; and (2) such further order, after due hearing and investigation, as would grant to the petitioners the right to charge a rate of fare which would provide a fair, reasonable and adequate return upon the investment. On the filing of the petition notice was at once given on the same day to the city of Chicago that a hearing on the petition would be held on August 4. The city of Chicago appeared and filed written objections, and after a hearing of evidence, in which counsel for the city participated, the commission found the facts alleged in the petition to be true; that the operating expenses of petitioners had been largely increased by an advance in wages and the increased cost of supplies and materials, and that they would not be able to obtain money with which to operate their lines unless prompt relief should be granted. An order was made on August 6 permitting the petitioners to charge seven cents for each passenger twelve years of age or over and four cents for each passenger under twelve years of age, children under seven years of age, accompanied by a person paying fare, to ride free. The rates so fixed were temporary in character and not to be effective after February 1, 1920, but the commission reserved the right to extend the effective period beyond that date or to order the discontinuance of such rate at any time prior thereto, and retained jurisdiction to further investigate the rates of fare authorized by the order and to make further findings and orders as might be justified by the facts determined at a subsequent hearing or hearings, and the application for a hearing and investigation for the establishment of permanent rates was granted and was set for hearing on September 8, 1919. From that order the city of Chicago appealed to the Sangamon circuit court, and that court being of

the opinion that the commission had no authority to make any change in rates except upon a full and complete hearing and investigation from which a fair return upon the investment could be based, set aside the order and remanded the proceeding to the commission, with directions to admit evidence as to the valuation of the property involved and the amount of expenditures and to enter the proper findings and order thereon. From the judgment of the circuit court the petitioners appealed to this court.

A motion was made by the city of Chicago to dismiss the appeal to this court, and the motion was denied but was renewed upon the hearing and insisted upon in argument. The order of the commission found that the petitioners were furnishing service for less than cost and authorized them to put in effect a temporary or provisional schedule of increased fares. The commission did not consider or act upon the application for a hearing and investigation for the establishment of permanent rates but continued the application and set the hearing for September 8, 1919. The circuit court set aside the order permitting a temporary or provisional increase of rates of fare and remanded the proceeding, permitting the commission to have a hearing and investigation only for the determination of permanent rates, depending upon a valuation of the petitioners' property, operating expenses, repairs and renewals, and every other thing which would influence the determination of such rates. The finding was that an order fixing a rate without a complete investigation and valuation of the property was unlawful and void, and the judgment divested the petitioners of the right given by the order to charge the temporary rate thereby allowed. If the petitioners could not appeal from the judgment the only right given by the order would be absolutely lost, and if the judgment was erroneous the damage could never be retrieved and the petitioners restored to their rights. The judgment disposed of a definite and separate branch of the controversy and was final and appealable.

The petitioners contend that the judgment of the circuit court should be reversed because the city of Chicago had no right to appeal from the order, not being a representative of the individuals compelled to pay the increased rate of fare, and therefore the court had no jurisdiction. The city was notified by the commission of the hearing and appeared by its counsel and cross-examined witnesses and was heard in argument, contending that the commission had no power to alter, change or abrogate in any particular a contract of the city with the petitioners fixing a five-cent fare. The city had such a contract, by which it became a sort of partner with the petitioners, entitled to and receiving more than one-half of the net proceeds of fares collected. The question of the rights of the city under the contract was involved and it had a right to appeal from the order superseding the contract in regard to rates of fare.

A question argued at length is whether the General Assembly, acting through the State Public Utilities Commission as its authorized agency, may lawfully change the rate of fare fixed by contract between a municipality and a public utility, such as a street railway corporation. That question was recently given full consideration upon the same authorities here cited and relied upon, in the case of *Public Utilities Com.* v. *City of Quincy,* 290 Ill. 360, and it was there held that the General Assembly has such power. It was there determined that the power to regulate rates to be charged by a public utility is vested in the General Assembly; that the General Assembly has never conferred upon any municipality power to make inviolable contracts for rates for a public utility; that such power of a municipality is not to be implied from authority granted to control streets and regulate the use thereof by public utilities; that section 4 of article 11 of the constitution, providing that no law shall be passed by the General Assembly granting the right to construct and operate a street railroad within any city, town or incorporated village without requiring

the consent of the local authorities having the control of the street or highway, is, like all other provisions of the constitution concerning legislative power, a mere limitation upon the power of the legislature and does not imply authority to bind the General Assembly by a contract regulating rates of fare, and that the General Assembly has never abdicated or renounced in favor of any municipality its legislative power in respect to regulating public utilities. The argument in this case has served to confirm the reasoning and conclusions of the opinion in that case, and it is neither necessary nor advisable to repeat what was there said.

It is strenuously urged, however, that the doctrines there declared do not apply here because of the different nature of the contract of the city with the petitioners and the fact that the ordinance creating the contract was adoped under the so-called Mueller law. That law, passed in 1903, is entitled "An act to authorize cities to acquire, construct, own, operate and lease street railways, and to provide the means therefor," (Laws of 1903, p. 285,) and it seems to have been re-enacted under the same title in 1913, (Laws of 1913, p. 455,) both acts appearing in Hurd's Statutes of 1917. Under that act ordinances were passed granting to the street railway companies then operating the street railways in the city the right to operate street railways in the streets of the city twenty years, until February 1, 1927, and it was provided that they should be entitled to charge five cents for each passenger twelve years of age or over and three cents for each passenger under twelve years, and children under seven years of age, accompanied by a person paying fare, were to ride free; that on or before April 10 in each year the company should come to an accounting and settlement with the city as of January 31 last preceding; that on such accounting all expenses of operation, including maintenance, repairs and renewals, taxes and assessments, and a sum equivalent to five percentum for the

preceding year on the cash purchase price, should be deducted and the net receipts should be divided between the company and the city in the following proportions: Forty-five per cent to the company and fifty-five per cent to the city. It was intended that the share paid to the city should purchase the property and the city or its licensee would then operate the railways. There was a supplementary unification ordinance, by which the street railways were to be operated as a single system, with the same rate of fare and division of the income. There is nothing in the act which either directly or by inference in any manner affects the power of the General Assembly to regulate rates of fare. The only mention of that subject is in a section providing for mortgaging the property, which provides that any mortgage may carry the grant of a right to maintain and operate the street railway covered thereby for a period not exceeding twenty years from and after the date such property may come into the possession of any person or corporation as the result of foreclosure proceedings, which privilege or right may fix the rates of fare which the person or corporation securing the same as the result of foreclosure proceedings shall be entitled to charge in the operation of the property for a period not exceeding twenty years. A mortgage with such a provision, or a resulting foreclosure, could not possibly affect the power of the General Assembly to regulate fares while in the hands of the mortgagor. If it could have any effect as an abdication of the power of the General Assembly the prescribed condition does not exist.

But it is said that the city acquired valuable rights under the act by the contract under which it receives the greater part of the net income, and that while the raising of the fares would not destroy the contract but would give the city more, the principle that the General Assembly may control rates would permit lowering the fares, so that the

share of the city in the net receipts would not be sufficient to enable it to purchase the property. The suggestion affords no basis for not maintaining the power of the General Assembly to regulate rates of fare to the end that citizens of the State may be carried for a reasonable compensation for the service rendered even if the city's share of the income from the property would not be sufficient to purchase the property. A municipality is a mere agency of the State, and, whether invested with the fee or a mere easement in streets, it holds them in trust for the people of the whole State, and, so far as their use for street purposes is concerned, every citizen of the State has an equal right, and is represented not alone by the city of Chicago but by the General Assembly. It was said in *Public Utilities Com. v. Chicago and West Towns Railway Co.* 275 Ill. 555, that a contract may relate to matters which do not affect public safety, welfare, comfort or convenience, and the exercise of the legislative power to fix rates does not abrogate a contract as to any of those things, and that the public was not interested in the question of what becomes of the net receipts; but that was, of course, with the implied qualification that the rates of fare shall be only reasonable compensation for the service rendered. The General Assembly has the power and is charged with the duty to see that rates of fare in the use of streets are reasonable, within the limit, on the one hand, of a fair return to the railway company and reasonable compensation for the service rendered, and the interest of the city cannot affect the exercise of that power and duty.

It is also urged that the court in the *Quincy case, supra,* did not give sufficient attention to the statutory provision following section 4 of article 11 of the constitution. That act prohibits the location or construction of a street railroad upon or along any street without the consent of the corporate authorities of a municipality, but such consent may be granted for any period, not longer than twenty

years, on the petition of the company, upon such terms and conditions, not inconsistent with the provisions of the act, as the corporate authorities shall deem for the best interests of the public.

The Supreme Court of the United States has decided in several cases that a legislature may disable itself to exercise its legislative power to regulate rates to be charged by a public utility, or suspend the exercise of such power, by delegation to a municipality to make a contract inviolable during a reasonable term of years, and that when such legislative authority is given for a definite term, and being subjected to judicial scrutiny is not grossly unreasonable in point of time, a contract will be protected from impairment. (*Detroit* v. *Detroit Citizens' Street Railway Co.* 184 U. S. 368; *Vicksburg* v. *Vicksburg Waterworks Co.* 206 id. 496; *Home Telephone Co.* v. *Los Angeles,* 211 id. 265.) The recent case of *Union Dry Goods Co.* v. *Georgia Public Service Corporation,* 248 U. S. 372, related to the right of a private corporation, empowered to contract in its business without any enabling act of legislation, to make a contract for an apparently reasonable time for service by a public utility. By the contract the Public Service Corporation agreed to furnish electric light and power to the dry goods company at its place of business in Macon, Georgia, for five years at stipulated prices, which the dry goods company agreed to pay. During the time the railroad commission fixed higher rates for the service, and the question considered was whether the rates fixed in the exercise of the police power suspended the contract. The decision was that they did, and the court quoted from *Hudson County Water Co.* v. *McCarter,* 209 U. S. 349, that "one whose rights, such as they are, are subject to State restriction can not remove them from the power of the State by making a contract about them." The doctrine of *Atlantic Coast Line Railroad Co.* v. *Goldsboro,* 232 U. S. 548, that the power to establish police regulations cannot either be ab-

dicated nor bargained away and is inalienable even by express grant was repeated.

If power can be given to a municipality to contract where an individual could not, this court has never adopted the rule that the power of the General Assembly to make police regulations can be suspended or parted with as to either. Whenever that rule has been applied the court has held that inasmuch as such a contract has the effect of extinguishing *pro tanto* an undoubted power of government, both its existence and the authority to make it must clearly and unmistakably appear and all doubts must be resolved in favor of the continuance of the power. (*Home Telephone Co.* v. *Los Angeles, supra,* and cases there cited.) While the contract clause of the Federal constitution requires that court to determine for itself whether there is a contract and the extent of its binding obligation, where the statute of a State is alleged to create or authorize a contract inviolable by subsequent legislation of the State, in determining its meaning much consideration is given to the decisions of the highest court of the State. *Freeport Water Co.* v. *Freeport,* 180 U. S. 587; *Milwaukee Electric Railway and Light Co.* v. *Railroad Com. of Wisconsin,* 238 id. 174; *Vicksburg* v. *Vicksburg Waterworks Co. supra.*

It is perfectly clear to us that the statutory provision that consent may be granted by corporate authorities to locate or construct a street railroad upon or along any street for any period not longer than twenty years, upon such terms and conditions, not inconsistent with the act, as the corporate authorities shall deem for the best interests of the public, does not clearly and unmistakably confer upon the corporate authorities the right to contract with the street railway company for rates of fare for a period of twenty years free from legislative control; and this would be especially true of a contract creating a partnership between the utility and the municipality by which the municipality shares in the income from the rate fixed. As the streets

are for the use of all citizens of the State, the question of rates of fare is not one of local concern, merely, or of local politics. It would not only be a strained and unreasonable construction to say that the statute was intended to give the corporate authorities the right to fix rates, under varying conditions, for a period of twenty years, but in the judgment of the court it would be grossly unreasonable in point of time and not within any rule established by the Supreme Court of the United States.

It is generally held by courts that when a privilege or right to use a street for a lawful purpose is granted by a municipality for an adequate consideration by an ordinance which is accepted and acted upon by the grantee, it is not a mere license but becomes a contract binding upon the parties from which neither can recede, and this court has declared that rule in various cases. (*Chicago Municipal Gas Light Co.* v. *Town of Lake,* 130 Ill. 42; *City of Belleville* v. *Citizens' Horse Railway Co.* 152 id. 171; *Village of Madison* v. *Alton, Granite and St. Louis Traction Co.* 235 id. 346; *People* v. *Chicago Telephone Co.* 245 id. 121; *City of Springfield* v. *Interstate Independent Telephone and Telegraph Co.* 279 id. 324.) It may be true that the constitutional and statutory provisions imply authority of a municipality to make an agreement with the public utility as to rates binding on the parties to the contract so that neither one can repudiate the contract with the other and it can only be abrogated by them by mutual consent, but that is a very different proposition from authority to deprive the State of its right to regulate fares, and lower them if found to be excessive and more than reasonable compensation for the service performed, or to raise them if so low as not to be fair, just and reasonable to the public utility. This answers the argument that there can only be an increase in rates of fare on condition that the petitioners surrender every right secured to them by the contract. The contract being subject to legislative control, the intervention of the

State, either on behalf of the public utility to secure a reasonable return for the service rendered or of the city to cause a reduction of rates which have become excessive, does not abrogate a contract, of which the law is an integral part.

To sustain the judgment of the circuit court it is insisted that the commission had no authority to fix a temporary rate based upon increased operating expenses, and could only make a change upon a full hearing and examination which would demonstrate what a permanent rate ought to be. So far as we have been informed, every court which has considered that question has decided to the contrary. (*Omaha and Council Bluffs Street Railway Co.* v. *Nebraska City Railway Com.* 173 N. W. 690; *City of Charleston* v. *Public Service Com.* 99 S. E. 63; *Kansas City* v. *Public Service Com.* 210 S. W. 381; *O'Brien* v. *Public Utilities Comrs.* 105 Atl. 132.) Section 36 of the Public Utilities act authorizes the commission, for good cause shown, to allow changes in rates without requiring the thirty days' notice therein provided for, by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published. The evident purpose of this provision was to provide for emergency orders, and it empowers the commission to permit a temporary rate to meet an existing condition, limited to the time required for making an investigation and finding what a permanent rate should be. Any temporary increase must necessarily be to some extent an experiment, because results can only be definitely determined by an actual test, but if a temporary rate should prove too high the condition may be rectified when the test is applied, and no substantial wrong can result.

Complaint is made that the city was not given a reasonable opportunity to be heard and to have a full and fair investigation. The city appeared and protested against proceeding with the hearing on the ground that there should

be a full investigation and that the books of the company should be produced showing the expenditures made by the petitioners, and each of them, for the past twelve years for maintenance, repairs, salaries, dividends paid to the stockholders, and all other matters bearing on the determination of a reasonable rate. The attitude of counsel for the city was the same then as now: that before the temporary rate could be fixed there must be a full and complete investigation of the valuation of the petitioners' property and a thorough examination of their books. It was shown such a hearing and examination would be impossible and would defeat the object of the application for the temporary rate to meet increased expenses and save the petitioners from bankruptcy. Not only was that true, but there had recently been a most extended examination of all those matters. On November 21, 1918, the petitioners had made application to the commission for increased rates of fare and there had been a hearing on the application occupying several months. On April 25, 1919, the commission denied the application for an increase, and the entire record in that extended hearing was offered by the city as an adjudication against the petitioners that the five-cent rate was reasonable, and by the petitioners to show the extended hearing which had been held and the facts disclosed thereby. The commission made the entire record in the former application a part of the record in this, showing that everything contended for by the city had been recently presented to the commission. Under the contracts, representatives of the city had always had access to the books and records, and they were audited every year by an accountant selected by the city. The board of supervising engineers, on which the city had a representative, kept a check on all work and expenditures, and a full, detailed annual report of all accounts was made to the city controller. The city was not deprived of any right and there is no reasonable ground for the complaint.

Counsel for the city assail the commission with charges that the increased rate was determined upon at secret meetings with the officers of the petitioners and that the case was prejudged.    There is no basis whatever for such a charge.    Governor Lowden called upon the commission, as provided by section 8 of the Public Utilities act, to investigate and report as to the situation in Chicago, which was threatening to tie up the city and interfere with business, and the commission, in discharge of its duty, did make an investigation, at which the contending parties, consisting of representatives of the employees and officers of the petitioners, were present.    The commission would be justly chargeable with neglect of duty if it had not done what it did.

The evidence on the hearing justified a temporary increase in rates of fare to meet the increased operating expenses, mainly through the increased wages of employees. It is the argument of the city that the five-cent fare fixed by the contract afforded a fair and adequate return to the petitioners for their investment, and that it was so decided by the commission on April 25, 1919, after the extended hearing and investigation.    The city offered the record of the former hearing as an adjudication that the five-cent fare was then reasonable and proper.    It was not in any sense an adjudication or determination by the commission what would be a reasonable and necessary rate of fare under changed conditions.    If the five-cent fare fixed by the contract, and determined to be still reasonable and proper on April 25, 1919, was just to the parties, it is beyond question that it was not just and fair after the operating expenses had been very greatly increased.    In *O'Brien* v. *Public Utilities Comrs.* 106 Atl. 414, the court expressed a view upon a similar question, as follows: "Assuming that the rate of five cents existing prior to the new conditions was a reasonable one, then the application of ordinary common sense will unhesitatingly lead every fair-minded person to

the conclusion that it would not continue to remain reasonable if the cost of production so advanced as to destroy the basis upon which it was rested. The solution of such a proposition does not require the aid of legal learning. It is a question of economics which anyone of ordinary intelligence can apply." It might be that upon a test an increase to seven cents would be greater than necessary to meet the new conditions, and the commission retained power to change the rate from time to time as conditions might change, and the rate was not to be effective after February 1, 1920, unless extended by order of the commission. No wrong could result from such an order.

The judgment of the circuit court is reversed and the order of the Public Utilities Commission is affirmed.

*Judgment of circuit court reversed.*
*Order of commission affirmed.*

Mr. JUSTICE DUNCAN, dissenting:

I concur in the opinion of the court in every particular except the conclusion that the evidence in the record justifies the increase in rates allowed by the commission. Section 36 of the Public Utilities act expressly provides that no public utility shall increase any rate or charge, under any circumstances whatsoever, except upon a showing before the commission and a finding by the commission that such increase is justified. The evidence in this record convinces me that the finding of the commission that the increase in the rates allowed by it to appellants is justified is manifestly against the weight of such evidence. I therefore respectfully dissent from the decision of the court upon that question.