Jones, J.,
dissenting. The judgment in this case is supported by a bare majority, who are unable to agree on a syllabus. An inspection of the opinions supporting it discloses a divergence among the three judges announcing their individual opinions. And it is not clear why the Ohio Constitutional Amendment of 1912 has been referred to, for it may be conceded that the validity of the contract in question, as stated by Johnson, J., is to “be determined by the law in existence at the time it was made.”
*142 In the present case the judgment of the majority is based upon the fact that in 1899 a municipality had, by virtue of a consent .statute, the power to fix a maximum rate for a period of years by an agreement between itself and the public utility, and thereby nullify the state’s power thereafter to fix the telephone rates through its commission. Were the state not a party attempting to invoke the jurisdiction of its commission in the exercise of its sovereign power, the application of the authorities cited in the majority opinions would be germane. But the decision is predicated upon the following erroneous assumptions:
First. It overlooks the fact that the state is here seeking to exercise its own powers, and the question, involved is not what obligations may have existed between the contracting parties, inter sese, arising out of their rate contract.
Second. It mistakenly assumes that the conduit consent statute gives the city and the utility the right to fix rates which the state- Is powerless to change.
In 1899 a franchise and maximum-rate contract between these parties was entered into. It is nowhere claimed that there was any express power of rate regulation of telephone companies resting in the municipality at the time the contract was made. The only authority given the municipality at that time was contained in Section 9197, General Code. That section is as follows:
“Any company * * * in any city or village in this state, may construct and maintain * * * conduits and other fixtures for containing, protect *143 ing and operating such wires in the streets and public ways of such city or village in the state, when the consent of such city or village has been obtained therefor.”
The majority opinion holds that by virtue of this consent statute, empowering the city to grant or withhold its consent to the telephone company, the municipality had as incident thereto the right also to contract with reference to the.rates which should govern during the time of the franchise.
It has been uniformly held that the regulation of rates is a police power, that the police power is one of the sovereign powers of the state, and that this power cannot be renounced unless the renunciation is expressed in clear and unequivocal language.
State, ex rel. City of Toledo, v. Cooper, County Auditor, 97 Ohio St., 86; Milwaukee Electric Ry. & Light Co. v. Rd. Comm. of Wisconsin, 238 U. S., 174; Union Dry Goods Co. v. Georgia Public Service Corp., 248 U. S., 372; Home Telephone & Telegraph Co. v. City of Los Angeles, 211 U. S., 265, 273; Portland Ry., Light & Power Co. v. City of Portland, 210 Fed. Rep., 667, 671; Stone v. Farmers Loan & Trust Co., 116 U. S., 307; Chicago Railways Co. v. City of Chicago, 292 Ill., 190, 195, and City of Richmond v. Chesapeake & Potomac Telephone Co., 127 Va., 612.
In 1899 there were other public utilities with which municipalities were granted the express power of contract, with reference to rates, but no such statute appears governing rate contracts made with telephone companies. It has been uniformly .held in this state that municipalities have only the *144 powers expressly granted by the legislature or those impliedly necessary to carry such express powers into effect. Townsend, v. City of Circleville, 78 Ohio St., 122; Ravenna v. Pennsylvania Co., 45 Ohio St., 118, and Ohio Electric Ry. Co. v. Village of Ottawa, 85 Ohio St., 229, 237.
It has been decided by the supreme court of this state in two cases, one reported with and the other without opinion, that under our statutes affecting telephone rates municipalities do not have the right to fix rates for telephone charges. In Farmer v. Columbiana County Telephone Co., 72 Ohio St., 526, decided in 1905, it was held that telephone companies obtain their power to construct their lines in municipalities from the state; that municipalities have only the power to agree with telephone companies as to the mode of use and for such compensation only as may be necessary to restore the streets to their former state of usefulness. “They have not power to exact or receive compensation by way of free telephone service for themselves or for citizens, or to fix rates for telephone charges.” This case has not been overruled.
Just one year earlier this court, in the case of City of Findlay v. Findlay Home Telephone Co., reported without opinion in 70 Ohio St., 507, affirmed the circuit court decision of Macklin against the same company (Macklin v. Home Telephone Co., 1 C. C., N. S., 373, 14 C. D., 446), which had upheld the same principle.
This is not a case where a contract has been entered into between the parties by virtue of express authority given to fix rates, as with other *145 utilities. This is a case where no authority has been expressly granted other than that consent may be given by the municipality to the utility for the occupation of its streets by a conduit. Where statutes of this character have been under consideration by the courts it has uniformly been held, that, where the state or its commission is involved, grants to a municipality by a state legislature enabling it to grant franchises either by its consent or by the imposition of terms or conditions do not empower the municipality to fix rates beyorid the. control of the state thereafter to change. And in connection with this feature of the case the majority opinions clearly ignore the later cases upon this subject, where this question arose under exercise of the reserve powers of the state acting through its commission. The principle herein contended for is announced both by state and federal courts as will be seen by an inspection of the following cases: Home Telephone & Telegraph Co. v. City of Los Angeles,, 211 U. S., 265; City of Pawhuska v. Pawhuska Oil & Gas Co., 250 U. S., 394; Producers Transp. Co. v. R. R. Comm. of California, 251 U. S., 228; Puget Sound Traction, Light & Power Co. v. Reynolds, 244 U. S., 574; Columbus Ry., Power & Light Co. v. City of Columbus, 249 U. S., 399; Union Dry Goods Co. v. Georgia Public Service Corp., 248 U. S., 372; Milwaukee Elec. Ry. & Light Co. v. Rd. Comm. of Wisconsin, 153 Wis., 592; People, ex rel. Village of South Glenn Falls, v. Public Service Comm., 225 N. Y., 216; Chicago Rys. Co. v. City of Chicago, 292 Ill., 190; Central Union Telephone Co. *146 v. Indianapolis Telephone Co., 126 N. E. Rep., 628, 630; City of Washington, Ind., v. Pub. Service Comm., 129 N. E. Rep., 401; Hoyne, State’s Atty., v. Chicago & Oak Park Elevated Ry. Co., 294 Ill., 413; City of Richmond v. Chesapeake & Potomac Telephone Co., 127 Va., 612.
The following cases hold that consent statutes of this character do not give municipalities authority to fix rates which are beyond the power of the state to modify.
In the case of People, ex rel. Village of South Glenn Falls, v. Public Service Comm., supra, a similar statute was involved. There the New York statute, provided that gas companies were empowered “ 'to - lay conductors for' conducting gas through streets * * * zvith the consent of the municipal authorities thereof, and under such reasonable regulations as they may prescribe.’ ”
In September, 1900, the village of Glenn Falls granted the gas company the right to use the streets of the village for the term of 50 years, and provided that as a consideration therefor the company should charge no greater rate than $1.25 per 1000 cubic feet for illuminating or fuel gas. In August, 1917, the company increased its rate to $1.50 per 1000 cubic feet. Thereupon in the following January the village of Glenn Falls made complaint to the public service commission, asking that the gas company be restrained from raising its rates above $1.25 per 1000 cubic feet, alleging that the franchise of 1900 constituted a valid knd binding contract for the full term of 50 years. The question determined by the N. Y. Court of Appeals was *147 whether the public service commission had the power, under the circumstances mentioned, to regulate the price of gas. It was held that rate regulation being a matter of police power, the public service commission had authority to regulate charges made by the gas company, distinguishing the case of Matter of Quinby v. Public Service Comm., 223 N. Y., 244, and reversing the appellate division which had held that the public service com-, mission had no power over the matter and had granted the demand of the village that the company should be prohibited from charging more than the rate fixed in 1900.
In the case of Milwaukee Electric Ry. & Light Co. v. Railroad Comm. of Wis., 238 U. S., 174, the supreme court of the United States had under consideration the Wisconsin statute, which provided that .a municipal corporation might grant to any corporation the right to construct, maintain and operate street railways and their use “upon such terms as the proper authorities shall determine,” etc. Justice Day at page 183, quoted the following from the opinion of the chief Justice in a former Wisconsin case: “‘No specific authority having been conferred on the city to enter into the contract in question, the right of the State to interfere whenever the public weal'demanded zvas not abrogated. The contract remained valid between the parties to it until such time as the State sazv fit to exercise its paramount authority, and no longer. To this extent, and to this extent only, is the contract before us a valid subsisting obligation. It would be unreasonable to hold that by enacting Sec. *148 1862, Stats. (1898), or Sec. 1863, Stats. (Supp. 1906: Laws of 1901, ch. 425), the State intended to surrender its governmental power of fixing rates. The power was only suspended until such time as the State saw fit to act.’ ”
A similar question arose in the case of City of Winchester v. Winchester Water Works Co., 251 U. S., 192. There a Kentucky statute provided that the board of council of a municipality may grant a right of way over public streets to any railroad or street railroad company “on such conditions as to them may seem proper,” etc. Justice Day in that case says of that statute: “This language is certainly very far from that express authority to regulate rates, which is essential in order to enable municipalities so to do.”
We can see no difference between a statute imposing “terms and conditions” and a statute imposing “consent.” If anything the former implies greater municipal authority. However, both relate to manner of occupancy, and cannot, by any sophistry, relate to, the fixing of rates. Whether one term or the other is used, how is it possible to say that the state in either case has renounced its own power of rate fixing “in clear and unequivocal-language?” Counsel cannot find a statute anywhere wherein a municipality has been granted power over telephone rates. The statutes of Ohio do grant explicit power of rate fixing as to other various utilities. And the very lack of such granted power as to telephone companies is a strong argument that nope was intended.
*149 In the case of Chicago Rys. Co. v. City of Chicago, 126 N. E. Rep., 585 (292 Ill., 190), it was held that the “Provision of Mueller Law providing that city authorities may consent to location or construction of street railroad upon street for period not exceeding 20 years, upon such terms not inconsistent with the hct as the city authorities deemed in public’s best interest, does hot confer upon the city authorities the right to contract with railway company for rates of fare for 20-year period free from legislative control.”
Cartwright, J., in that connection says, at page 200: “It is perfectly clear to us that the statutory provision that consent may be granted by corporate authorities to locate or construct a street railroad upon or along any street for any period not longer than twenty years, upon such terms and conditions, not inconsistent with the act, as the corporate authorities shall deem for the best interests of the public, does not clearly and unmistakably confer upon the corporate authorities the right to contract with the street railway company for rates of fare for a period of twenty years free from legislative control.”
As apropos to this feature of the case, distinguishing some of the cases cited in the majority opinion, the judge continues, at page 201 :■ “It may\ be true that the constitutional and statutory provisions imply authority of a municipality “to make an agreement with the public utility as to rates binding on the parties to the contract so that neither one can repudiate the contract with the other and it can only be abrogated by them by mutual con *150 sent, but that is a very different proposition from authority to deprive the State of its right to regulate fares, and lower them if found to be excessive and more than reasonable compensation for the service performed, or to raise them if so low as riot to be fair, just and reasonable to the public utility.”
Section 4, Article XI, of the Illinois Constitution, provides: “No law shall be passed by the General Assembly granting the right to construct and operate a street railroad within any city, town or incorporated village, without requiring the consent of the local authorities having the control of the street or highway proposed to be occupied by such street railroad.” On October 23, 1920, in Hoyne, State’s Atty., v. Chicago & Oak Park Elevated. Ry. Co., 128 N. E. Rep., 587 (294 Ill., 413), the supreme court of Illinois held that such provision of the constitution “neither abridges nor denies the state’s right to regulate or fix the rates for street railway companies.”
In the Indiana case City of Washington, Ind., v. Public Service Comm., 129 N. E. Rep., 401, in speaking of the question.of consideration, Ewbank, J., said that the case was controlled, so far as a question of rate making is concerned, “by the many cases which have held that a mere grant of power to consent that a public utility company shall use the city streets does not include power to make a contract that such company shall be exempt from further regulation of its charges, or any of them.” And the learned judge continues: “The rule that a contract by a city, or by a private corporation or individual, fixing the rate at which a public utility *151 company shall perform a service to such contracting party, for a period of years, cannot deprive the legislative authority of power to prescribe and enforce the payment of a higher rate of charge for such service within the period covered by the contract, where the state has in no way surrendered that right, has been declared so often in this and other jurisdictions that we shall content ourselves with citing a few of the decisions.” Some twenty decisions are accordingly appended to his opinion.
In the case of the City of Richmond v. Chesapeake & Potomac Telephone Co., 127 Va., 612, 616, the “city having the right under its charter and by, the general law (Code 1887, sec. 1287) to prohibit any telephone company from occupying the streets of the city with its lines without the consent of the council, by ordinance of October 15, 1901, granted a franchise” and fixed a rate for 30 years, and it was held by the supreme court of Virginia that this consent did not deprive the state of the power to change the rate fixed in the ordinance, and that the commission had the power to raise the rates above those fixed by the franchise.
Citation of further authorities upon tliis question would only tend to display the .overwhelming weight of opinion in its support.
Counsel for the city cite the states of Michigan, Maryland, Kentucky, Texas, Kansas, Indiana, Pennsylvania and New York, wherein the court of last resort of those respective, states, under statutes giving municipalities authority to consent, decided that as incident thereto a municipality had the right *152 to fix rates: Mahan v. Michigan Telephone Co., 132 Mich., 242; Boerth v. Detroit City Gas Co., 152 Mich., 54; Charles Simons Sons Co. v. Maryland Telephone & Telegraph Co., 99 Md., 141; Moberly v. Richmond Telephone Co., 126 Ky., 369; City of Emporia v. Emporia Telephone Co., 88 Kans., 443; Muncie Natural Gas Co. v. City of Muncie, 160 Ind., 97; Allegheny (City) v. Millville, Etna & Sharpsburg Street Ry. Co., 159 Pa. St., 411, and Rochester Telephone Co. v.Ross, 195 N. Y., 429.
These early cases from the states named can be readily distinguished by later decisions of the courts of those states. In the first place, the controversies involved in those.decisions arose largely before the commissions of the various states were created, through which the state exercised its police power to regulate the rates of public utilities. The earlier cases cited involve controversies between the parties themselves, to which the state itself was not a party. The distinguishing’principle is stated by Mr. Justice Day in Milwaukee Elec. Ry. & Light Co. v. Rd. Comm. of Wisconsin, 238 U. S., 174, in the following quoted language: “The contract remained valid between the parties to it until such time as the State saw fit to exercise its paramount authority, and no longer. * * * That power was only suspended until such timé as the State saw fit to act.” There is respectable authority which holds, as does Farmer v. Columbiana County Telephone Co., supra, that the utility, is not even then bound. There the state had not exercised its authority.
Let us now take the later decisions from the same states, upon the same question, where the liti *153 gation arose between municipalities and the state commission.
In Michigan, it was held in 1918, City of Traverse City v. Michigan Rd. Comm., 168 N. W. Rep., 481 (202 Mich., 575): “Where a city without a specific grant of legislative power to fix rates of common carriers enters into a franchise contract fixing the rates to be charged by a telephone company, such contract is subject to the reserved right of the state to change the rates.”
In Maryland, Yeatman v. Public Service Commission, 126 Md., 513, decided in 1915, it was held that “Contracts when entered into, even between individuals, are subject to the police, powers of the State, whenever such contracts relate to matters which are or may be subject to the exercise of such powers.”
In a case from Kentucky, City of Winchester v. Winchester Water Works Co., 251 U. S., 192, decided in 1920, it was held that a city cannot regulate the rates chargeable by a water company unless the authority to do so has been fully granted by the legislature. The Kentucky statute had provided that the board of council might grant the right of way over public streets “on such conditions as to them may seem proper.”
In City of Emporia v. Emporia Telephone Co., 88 Kans., 443, while authority for rate fixing was conceded by the court of that state under a consent statute, the judge delivering the opinion said that such consent “will govern until action is taken by the state or by its authority.”
*154 In Pennsylvania, in City of Scranton v. Public Service Comm., 268 Pa. St., 192, decided in 1920, the supreme court of that state held that the city of Scranton, under a statute providing for the consent of its local authorities, was conclusively presumed to have known that the sovereign police power had power to modify the terms of the consenting ordinance, and in distinguishing the case of Allegheny (City) v. Millville, Etna & Sharpsburg Street Ry. Co., 159 Pa. St., 411, the court said: “The question in the case was solely between the City of Allegheny and the railway company; the Commonwealth was not a party to it; the question now under consideration was not involved.”
In Indiana, City of Washington, Ind., v. Pub. Service Comm., 129 N. E. Rep., 401, decided in 1921, Ewbank, Judge, after stating that the Indiana statute contained nothing suggesting the púrpose on the part of the legislature to expressly authorize the city to fix water rates,' Stated that the case was “controlled so far as the question of rate-making is concerned, by the many cases which have held that a mere grant of pozver to consent that a public utility company shall use the city streets does not include power to make a contract that such company shall be exempt from further regulation of its charges, or any of them.”
In the state of New York, in the case of People, ex rel. Village of South Glenn Falls, v. Public Service Comm., supra, decided in 1919, under a statute which provided that gas companies had the power “to lay conductors for conducting gas *155 through streets * * * in each such city, village and town, with the consent of the municipal authorities' thereof,” the supreme court of that state held that the public service commission had authority to regulate the charges made by the gas company notwithstanding the municipal contract fixing rates.
In the case now under consideration an attempt is made to invoke the doctrine of estoppel against the state. It is difficult to conceive how the state could be estopped from the exercise of its police powers. If the municipality had no express authority to make the contract as to rates in 1899, the doctrine of estoppel naturally falls, for otherwise a municipality might tie the hands of the state by entering into a contract with a private corporation which the latter was powerless to make. However, the question of estoppel may be dismissed from the case under authority of Farmer v. Columbiana County Telephone Co., supra, wherein it is held that a rate contract made between the municipality and the utility at the solicitation of the latter did not create an estoppel under the Ohio telephone statute, even as against a telephone company which had solicited the rate and had acted under it.
“ ‘One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them.’ ” Union Dry Goods Co. v. Georgia Public Service Corp., 248 U. S., 372.
But it is said that there is no legislative power given to the public utilities commission of this state to review the question of rates. It will be observed that the facts disclose that there was á consolida *156 tion of telephone companies made by the public utilities commission on an application filed July 5, 1914. This was in compliance with statutory authority. Acting under the statute, the commission merged the various telephone companies, and then fixed the rate, as it was required to do under the consolidation act.
Section 614-61, General Code, provides that when such consolidation is made the same shall not become valid or effective until after the commission shall not only have determined the valuation upon which the rates are determined, but shall also “have fixed and determined such rates, tolls, charges and rentals so to be charged.” This was complete authority for the commission to fix the rates upon consolidation, and exercising its jurisdiction under that section the commission did fix the rates to be charged, and retained jurisdiction for further consideration of rates to be charged in the future. Whether the rate fixed at that time is to be considered an emergency rate, or not, it is unquestionable that the jurisdiction of the commission attached upon the rate feature of the case and the subject of rates to be charged was reserved under its order.
The whole scope of the public service commission act discloses that the entire jurisdiction over rates rests in the public utilities commission, with the exception (Sec. 614-47) that the act shall not apply to a rate prescribed by a municipal corporation granting a franchise for .street railroad or street railway purposes, or to prices fixed under other *157 sections of the General Code, the exception not applying to telephone companies.
It is claimed that this is not a question in which the state is a party or in which it has any concern, but that the real dispute arises between the municipal corporation and the public utility. It would be difficult to find any case wherein the-jurisdiction of the public utilities commission is involved where the real controversy does not arise between the utility and the municipality. In all such cases, however, under the provisions of our Code, the state is a party to the dispute. It has enacted laws by which these disputes must be submitted to the commission. It has provided in effect that the commission’s orders are subject to review by the supreme court. Certainly the state is a party to the action, not only in the spirit by which it has passed laws reserving to itself the right of rate regulation between the parties, but also because it has provided a method by which the orders of its commission shall be reviewed. .If it should be declared by this court that this is merely a matter of controversy between the contractual parties, then it is difficult to see how, in any case, these rate questions could be reviewed by this court. It follows, therefore, that the following principles are sound:
First. There was no statutory authority granting municipalities the right to fix rates for telephone companies.
Second. The conduit statute provided that conduits should be laid in the streets of the city, with the city’s consent, but did not grant the municipality the right to fix and regulate rates for the *158 future, so as to prevent the state thereafter from exercismg its power over that regulation.
Third. The state, therefore, having acted under its public utility law, through its public utilities commission, the parties to the alleged contract must submit themselves to the law requiring the public utilities commission to fix rates which should be charged. This being so, it necessarily follows that the' judgment should be affirmed.