CHARLES F. X. O'BRIEN, PROSECUTOR, v. BOARD OF PUBLIC UTILITY COMMISSIONERS AND PUBLIC SERVICE RAILWAY COMPANY, RESPONDENTS.

Argued October 14, 1918—Decided October 18, 1918.

1. A resident, citizen and owner of real estate, in a municipality in which some of the lines of a street railway run, has a proper standing to prosecute a writ of *certiorari* to review an order by the board of public utility commissioners increasing the rate which the railway is allowed to charge for transportation of passengers.

2. The scope of the Public Utility act is very broad and was meant to give full control of all public utilities to the board so far as could be done by legislation.

3. In order that the board of public utility commissioners may acquire jurisdiction to grant an increase in rates to a public utility, under section 17 of the Public Utility act (*Pamph. L.* 1911, *p.* 374) it is not necessary that there be evidence before the board of the value of the property of such public utility, where the justice and reasonableness of such rate can be determined without first ascertaining the value of the property.

4. A just and reasonable rate for the service rendered by a public utility is rather a question of business judgment than one of legal formula, and must often be tentative, since the exact result cannot be foretold, and the real test of the justice and reasonableness of an individual rate is that it should be as low as possible and yet sufficient to induce the investment of capital in the business and its continuance therein.

On *certiorari*.

Before Justice SWAYZE.

For the prosecutor, *George L. Record* and *Marshall Van Winkle.*

For the board of utility commissioners, *L. Edward Herrmann.*

For the Public Service Railway Company, *Richard V. Lindabury.*

The opinion of the court was delivered by

SWAYZE, J. By an order of July 10th, 1918, the board of public utility commissioners fixed as just and reasonable, a charge of one cent on all initial transfers issued by the Public Service Railway Company to its passengers, in addition to the charges theretofore exacted. Before this charge was to be collected the railway company was required to file with the commissioners its acceptance of the terms of the order. This was done.

By an order of September 25th, the board fixed as just and reasonable, a charge of seven cents where five was then charged, up to and including March 31st, 1919, and six cents on and after April 1st, 1919, in addition to the charge of one cent for each initial transfer. These charges were to be collected only in the event that prior to October 10th, the railway company filed its acceptance in writing of the terms of the order. This was done.

The prosecutor is a resident, citizen, and owner of real estate in Jersey City, in which some of the lines of the railway run.

I held at the argument that the prosecutor has a standing to prosecute the writs. No objection was made when the writs were allowed or when argument was had as to the granting of a stay. Under those circumstances, it is too late to make the objection at final hearing after the return to the writ has been made. Even if the objection had been timely, it must have been overruled. The matter probably concerns every resident of the city, and an increase of street railway

rates affects his pecuniary interest directly as a probable passenger and indirectly as interested in cheap urban transportation. If the question had been raised at the proper time I have no doubt Mr. O'Brien's interest could have been easily proved. It was not questioned but was taken for granted. I therefore overrule the objection.

The chief point made by the prosecutor is that the board of public utility commissioners was without jurisdiction to make the orders, since they were made without evidence of the value of the property of the railway company. The prosecutor assumes that the only power of the board in respect to rates is to fix just and reasonable individual rates, after hearing upon notice, as provided in paragraph (c) of section 16 of the Public Utility act. This section may properly be described as the section of the act which authorizes the board to take proceedings adverse to the "public utility" and to require it to do what it may not want to do. It is because the proceedings under that section are *in invitum,* that care is taken to provide for notice and a hearing, without which the proceedings would be without due process of law. If section 16 were the only section of the act applicable, there would be some force in the prosecutor's contention. There are other sections which prevent this narrow construction of the act. The scope of the act, as we have recently said, is very broad; it was meant to give full control of all public utilities to the board so far as could be done by legislation. *Atlantic Coast Electric Ry. Co.* v. *Board of Public Utility Comrs., post p.* 168. The act provides not merely for proceedings *in invitum,* but by paragraph (h) of section 17, for agreement between the board and the "public utility." That paragraph provides for an increase of rates by the "public utility" itself, authorizes the board to hear and determine whether the increase is just and reasonable, and makes it the duty of the board to approve the increase upon being satisfied that the same is just and reasonable. The difference in the two methods is fundamental. One is the method of litigation, long, expensive, unsatisfactory, necessarily too slow to afford prompt relief, and sure to do injustice by delay to one side or the other. The other we may call the

method of agreement, or bargaining, if we choose; prompt and comparatively satisfactory, and resulting, if not always in abstract justice, yet in a determination, which in the hands of fair-minded men, is likely to be acquiesced in. When we consider the well known object of this legislation, apparent in many sections of the act, we cannot believe that the legislature meant to limit the power of the board to a power to make war on much of the most important business of the state. The difficulty meant to be remedied was the control by private corporations or individuals, necessarily monopolistic in character, of business affected with a public interest. The aim of the legislature was to subject such corporations (or individuals if there were any in the same situation of monopolistic vantage), to public control so that a public board, charged with the interests of the public, might have a measure of control over the service to be rendered and the price to be paid therefor. Justice to all, as the policy of the state, is evinced in the act. The difficulty of securing justice through political or judicial methods is not necessarily inconsistent with the legislative policy. The readiest means to approximate that end is the method of agreement provided by paragraph (*h*) of section 17. The contrast between the method of section 16 and the method of section 17 could not be better shown than it is by making the board the actor in section 16 (*c*), and making the "public utility" the actor in section 17 (*h*). It is of no consequence that in the present case the Public Service Railway Company began the proceedings by a petition asking the consent of the board instead of itself increasing the rate and waiting for the board to act upon someone's written complaint or on its own initiative. The essential thing meant to be secured by section 17 (*h*) was agreement between the "public utility" and the board. No right could be lost by the petition, a method more polite or more politic as we choose to call it. In fact the exact method provided by section 17 (*h*) has been pursued in this case. The railway has increased its rates. It has merely secured in advance the assurance that the board will take no adverse action. If it should be considered important, the

board may now, being satisfied as it has already said, that the increase is just and reasonable, approve of the increase, and there would not be even an appearance of any but the statutory method. But neither its prior approval of the petition nor a subsequent order if the board make one, is necessary to secure the same end. Paragraph (*h*) distinctly recognizes that the "public utility" retains its power to increase rates; it gives the board power to determine whether the increase is just and reasonable, but it does not compel the board to act on its own initiative; if it does not, the increase is in effect unless some one makes a written complaint.

The evidence shows that the increase was only enough to enable the railway to meet the increased expense forced upon it by the order of the war labor board of the federal government to increase wages. The increase permitted the railway allowed nothing for return on large investments of capital. The railway, if its petition had been denied, would have had ground to complain that the rate allowed was not just and reasonable. Since its petition was granted, it cannot complain. The prosecutor is in no position to complain. He did not venture to introduce evidence or to contradict the evidence offered on the part of the railway. He contents himself with urging that there was no evidence of the value of the property of the railway, and assumes that the justice and reasonableness of a rate can only be determined by first ascertaining the value of the property devoted to the public service. I am unable to follow his reasoning. The question of the reasonableness of a rate has always been regarded as complex and as largely a business question.

Even in the narrower question of determining the value of the property, it has long been settled that the original cost of construction, the amount expended in permanent improvements, the amount and market value of bonds and stocks, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration and are

to be given such weight as may be just and right in each case. The reasonable worth of the services rendered is a maximum of the permissible rate and a fair return on the value of the property is a minimum. *Smyth* v. *Ames,* 169 *U. S.* 466. Such a standard is certainly a flexible one and sustains the view taken by this court in *Public Service Co.* v. *Public Utility Board* (the gas rate case), 84 *N. J. L.* 463. We there said that a just and reasonable rate is rather a question of business judgment than one of legal formula, and must often be tentative since the exact result cannot be foretold; and that the real test of the justice and reasonableness of an individual rate is that it should be as low as possible and yet sufficient to induce the investment of capital in the business and its continuance therein. The opinion in that case was adopted by the Court of Errors and Appeals, 87 *Id.* 597, and is the law of the state. Under the tests as stated by the courts, the value of the property is relevant to the question of a reasonable rate, but not conclusive. The reasonableness of the rate is the result, to borrow a scientific expression, of a composition of forces, some of which were set forth in the cases cited. There are others. There can be no better evidence of the reasonableness of a rate than its general adoption by the municipalities of this and other states in ordinances granting consent to the location of street railways, over a long succession of years, with acquiescence by the public without question and, as far as we know, without complaint either by the public or the boards of utility commissioners, while in the earlier days before public regulation came in vogue, the universal five cent fare had been most attractive to investors. It is true that changing times seem to have made the long accustomed rate of five cents unreasonably low, in view of the notorious fact that increasing burdens of expense have been imposed by public regulation and that the prices of everything and the wages of labor have increased. Five cents was certainly not on its face unreasonably high, since it was a standard rate, and there was an entire absence of proof on the part of the prosecutor. It follows with the certainty of a geometrical axiom that the

addition of just enough to meet the increased wages forced on the railway company by the war labor board, could not make unreasonably high what was not so before. The failure to allow any return on capital invested would, if this had been a case of the board fixing a rate instead of a case of its approving a rate fixed by the railway, have been a violation of the principle of the gas rate case that a just and reasonable rate must be sufficient to induce the investment of capital in the business and its continuance therein. It is argued by the prosecutor that the board could not proceed without evidence or a hearing even under section 17 (h). In view of the fact that the same result would follow mere inaction on the part of the board, I am unable to yield assent to the argument. It is at any rate beside the mark in the present case. Here there was evidence of the president of the railway company, and no evidence on the part of the prosecutor. I am unable to see how the board could draw any other conclusion than it in fact drew. The question of the justice and reasonableness of a rate, is a question of inference from facts proven, rather than in itself a matter of proven fact. The question is common in the law. Three examples are enough. A landowner on a running stream may make a reasonable use of the running water. It is for a court or jury, using its best judgment, to decide what is a reasonable use. Our conduct must be that of a reasonably prudent man. What is reasonably prudent conduct is for the jury using its best judgment to decide. At common law and under the act of congress known as the Sherman act, a contract in restraint of trade is valid if the restraint is reasonable, invalid if it is unreasonable. It is for the court or jury as the case may be, to decide what is reasonable or unreasonable in the light of the evidence and the decided cases. So in the question of a reasonable rate where there is evidence for and no evidence against the rate and no decided case holding the particular rate to be unreasonable, the tribunal whatever it may be, is compelled to the inference of reasonableness, as the board was in this case. If any doubt were left, it would be removed by the suggestions made by counsel for the prosecutor as to

the method by which the railway might meet this increased expense for wages. One counsel suggested that the difficulty might be met by decreasing the service rendered. I do not doubt that the service might be reduced to such an extent that a five cent fare would suffice. But that was not the problem presented to the board. Their problem was whether to approve the railway's plan to keep the service up to the present standard and allow it the means to pay the increased wages with which the war board had not provided it. The board had the power to reduce the efficiency of the service but apparently preferred to keep up the service even at the cost of increasing the rate. This is a question of business policy. No one, except counsel for the prosecutor, now suggests that a reduction of efficiency would be tolerable or tolerated. This solution of the difficulty seems out of the question. We can hardly imagine the municipalities, whose interests are represented by the prosecutor, adopting their counsel's suggestion that the deficiency in revenue might be met by a reduction in the efficiency of the service. The other counsel suggested, with seeming seriousness and indifference to results, that relief could be found in the appointment of a receiver, and that if upon a valuation of the property a fare of five cents would result in adequate return on that value, it could make no difference what effect it might have, and that the railway would only be in the position of one who had in the past made improvident bargains. This argument, however, overlooks the nature of the case and the issue presented. No one asked that the board determine what was a fair rate. The only issue was whether the increased expenses due to the action of the war labor board might properly be made up out of the proposed increased fare. The petitioner was the Public Service Railway Company and that company alone. If the proceedings were to be turned into one where the petitioner was to run the risk of business suicide, the interests of underlying companies would be affected; their contracts might be terminated, and it might even be impossible for them to earn a fair return on their investment. They would be entitled to notice and a hearing under section 16 (c).

Evidently the present proceeding contemplates no such remedy as a receivership as suggested by counsel. Probably no such remedy was contemplated by the legislature. The failure to provide a procedure by which so drastic a remedy could be legally accomplished, indicates that when the legislature by section 17 gave the board power by order in writing to require every public utility to furnish safe, adequate, and proper services and to keep and maintain its property and equipment in such condition as to enable it to do so, and by section 16 gave the board power after hearing upon notice, to fix just and reasonable rates which should be imposed, observed, and followed thereafter by any public utility, it was contemplating orders to the operating public utility only. I do not say that if a reasonable rate drove the operating company into insolvency, that rate could not be established against the underlying companies. I only say that the present proceeding is not adapted for that purpose. The act contemplates a regulation of still existing public utilities for the benefit of the public, not their destruction. It was decided more than thirty years ago that the constitutional power was a power to regulate, not a power to destroy. *Railroad Commission Cases,* 116 *U. S.* 307, 331. I am unable to agree with counsel for the prosecutor either that the remedy for the needs of the railway company to meet the higher wages of its employes is to be found in a lessened efficiency of service or in a receivership. There is no suggestion that government aid is possible. There is no other source of revenue except fares. I think the granting of the railway company's petition was required by the evidence.

The contention of the prosecutor that the rates fixed by ordinances cannot be changed by the consent of both the board and the railway company is disposed of, so far as this court is concerned, by the decision in *Collingswood Sewerage Co.* v. *Collingswood,* 91 *N. J. L.* 20, and in *Atlantic Coast Electric Ry. Co.* v. *Board of Public Utility Comrs., post p.* 168. The suggestion that the matter is one for the legislature alone and not for the public utilities commission is settled adversely to the prosecutor by the United States Supreme

Court (Railroad Commission cases, cited above), and by constant practice in this and other states.

The orders brought up by these two writs must be affirmed, with costs.