## PUBLIC SERVICE RY. CO. v. BOARD OF PUBLIC UTILITY COMMISSIONERS.

(District Court, D. New Jersey. October 12, 1921.)

1. **Courts ☞262(4)—Questions in issue on application for preliminary injunction to restrain enforcement of state statute or order.**

Under Judicial Code, § 266 (Comp. St. § 1243), providing that an application to a District Court for an interlocutory injunction to restrain enforcement of a state statute, or an order of a board or commission acting under a state statute, shall be heard and determined by three

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

[1] Fed. Cas. No. 13,619.

judges, a court so convened has to do solely with the allowance or disallowance of a preliminary injunction; all other questions being reserved until after trial. On the hearing of such an application in a suit by a street railroad company to restrain, as confiscatory, an order of a state commission fixing passenger rates, the court will not consider whether the company is overcapitalized or overbonded, whether its management is or is not efficient, or whether the rate fixed is in itself just and reasonable, but only the question whether the rate is confiscatory of the company's property, because based on a valuation of the property less than its worth at the present time.

:2. Carriers ⊜═12(9)—Franchise contracts fixing rates subject to reserved power of state.

Municipal franchise ordinances, prescribing rates to be charged by public service companies, are subject to the reserved power of the state to change such rates, and under the law of New Jersey, as settled by decisions binding on the federal courts, the power of the state Board of Public Utility Commissioners, created by statute, to fix rates to be charged . by a street railway company, is not limited nor affected by franchise contracts with municipalities.

:3. Carriers ⊜═12(7)—Presumption in favor of rate fixed by state board overcome only by showing beyond just or fair doubt that action was confiscatory.

To overcome the presumption in favor of the validity of a rate of fare for a street railroad company fixed by an administrative board, after a full hearing, the company, on an application for a preliminary injunction, must show beyond any just or fair doubt that the action of the board was in fact confiscatory.

·4. Carriers ⊜═12(5)—Rate fixed by state board held confiscatory.

Rates of fare prescribed by the Board of Public Utility Commissioners of New Jersey to be charged by a street railroad company held confiscatory, and enforcement of the order enjoined.

·5. Carriers ⊜═18(6)—Court, enjoining statutory rate, may fix conditional rate.

While a court of equity has no power to fix rates of fare to be charged by a street railroad company, it may, on granting a preliminary injunction restraining as confiscatory a rate established by a state board, name a rate as a condition of the injunction, beyond which the company may not go pending final adjudication and the determination of a just rate by a proper body, with provision for refunding of any excess above the board rate in case that rate is finally sustained.

· Davis, Circuit Judge, dissenting.

In Equity. Suit by the Public Service Railway Company against the Board of Public Utility Commissioners. On application for preliminary injunction. Granted.

Frank Bergen, of Newark, N. J., for Public Service Ry. Co.
L. Edward Herrmann, of Jersey City, N. J., for Board of Public Utility Com'rs.
Bleakly & Stockwell, of Camden, N. J., for city of Camden.
Albert O. Miller, Jr., of Passaic, N. J., for city of Passaic.
Randal B. Lewis, of Paterson, N. J., for city of Paterson.
Thomas J. Brogan, of Jersey City, N. J., for city of Jersey City.
Jerome T. Congleton, of Newark, N. J., for city of Newark.

Before WOOLLEY and DAVIS, Circuit Judges, and RELLSTAB, District Judge.

WOOLLEY, Circuit Judge. This action concerns the lawfulness of a rate fixed for a public utility under authority of a state statute.

The plaintiff is the Public Service Railway Company, a corporation organized under agreements of consolidation between many street railway companies, entered into by virtue of an act of the legislature of the State of New Jersey providing for the formation of traction companies and their regulation, approved March 14, 1893 (P. L. p. 302).

The defendant is the Board of Public Utility Commissioners, created by an act of the legislature of the State of New Jersey, establishing such a board and conferring upon it power fully to regulate and control public utilities, approved April 21, 1911 (P. L. p. 374). O'Brien v. Board of Public Utility Commissioners, 92 N. J. Law, 44, 105 Atl. 132; Id., 92 N. J. Law, 587, 106 Atl. 414.

The intervening defendants are the cities of Jersey City, Newark, Passaic, Paterson, Elizabeth, and Camden, municipalities through whose streets the plaintiff Railway Company operates certain lines and between whom and the Company there exists, it is alleged, rights and duties arising from ordinances, franchises, and contracts, which in their relation to the subject matter of this litigation, are separate and apart from any interests represented by the Board of Public Utility Commissioners and the Attorney General.

Given in bare outline, the events which lead up to this controversy are the following:

Public Service Railway Company controls, through consolidations, stock ownership and leases, sundry street railway corporations, which in turn control other railway corporations, and they in turn still others running back to the day of horse railways, through whose lines, on being connected and combined into an unitary system, it operates 2,649 passenger cars over 850 miles of track in 146 municipalities in the State of New Jersey, including interurban lines in several counties, serving, without limitation by municipal boundaries, a population of more than two million.

Speaking always in round numbers, the capital stock of the Company issued and outstanding is $48,700,000, of which $39,200,000 was issued in exchange and payment for stock of underlying railway corporations, and $9,500,000 was issued and sold for cash at par.

Prior to the consolidations by which the Company was created, the constituent or lessor companies had mortgaged their properties for the payment of bonds to the amount of $80,600,000. By virtue of the consolidation agreements these bonds, as well as the rentals reserved by the several leases, became direct obligations of the Company, requiring it to pay interest amounting to $3,700,000 and rentals amounting to $1,160,000 annually.

The Company pays annually more than $21,700,000 in maintenance and operating expenses, about $5,000,000 in fixed charges for interest on its bonded obligations and rentals for leased properties, and more than $2,000,000 for taxes. It now pays no dividend on its stock.

Prior to 1916, the Company charged a 5 cent fare throughout its system, a rate commonly regarded as just and reasonable for the service rendered. For a year or two prior to 1917 there was, as every one knows, a progressive increase in the cost of maintenance and operation of street railways growing out of the greatly increased cost of materials and increased wages and taxes, due to war.

Under this increased cost of maintenance and operation a surplus of $1,180,000 which the Company has accumulated up to the year 1917 was in 1918 changed into a deficit of $300,000. This deficit increased until 1920 it amounted to $743,000. The difference between income and outgo during these later years, the Company says, was not sufficient for it to meet its operating expenses, pay its fixed charges, and maintain its property in a state of efficiency. It was therefore compelled, during the years from 1917 to 1920, to borrow more than $2,348,000 for the purchase of new rolling stock.

Believing it impossible further to maintain and operate its property on a 5 cent fare, the Company, in March, 1918, filed with the Board a rate of 7 cents and charges for transfer. In July, 1918, the Board, refusing the increase, continued the base rate at 5 cents but allowed 1 cent for each initial transfer. Finding the income still inadequate, the Board, in September, 1918, fixed a rate of 7 cents and 1 cent for a transfer for a period limited to March, 1919. In May, 1919, the Board reinstated the rate of 7 cents plus 1 cent, where it remained until July 14, 1921.

The validity of the increase of this rate was reviewed by the Supreme Court and the Court of Errors and Appeals of the State of New Jersey in an action brought by Charles F. X. O'Brien, a citizen and rider, with the result that the courts sustained the increase and held that the Board may raise the rate of a public utility without evidence of the value of the property of the utility when the justice and reasonableness of the rate can be determined without first ascertaining the value of the property. 92 N. J. Law, 44, 105 Atl. 132; Id., 92 N. J. Law, 587, 106 Atl. 414.

During the controversy between the Board and Company with reference to the fixation of rates which would give a fair return on the property devoted to the public service, the legislature of the State of New Jersey passed an act entitled "An Act providing for the valuation of street railway property in this State." Laws of 1920, chapter 351. By this act the Governor, State Treasurer, and State Comptroller were constituted a commission for the purpose of ascertaining and determining the value of all properties of street railway companies of New Jersey. The act required the commission to select a competent electrical or mechanical engineering concern, equipped and organized for and experienced in the work of valuing street railway properties. The act, as later amended by the Act of 1921 (P. L. p. 954), also provided that the report of the engineering concern and "the value of the property as set forth in said report shall be accepted by the Board of Public Utility Commissioners of this State as presumptive evidence of the value of said property, as of the date specified in said report in any

rate proceeding under any law of this State to the extent that the value of said property is a factor in the fixing of a rate."

Pursuant to the Act of 1920 the Commission retained the engineering firm of Ford, Bacon & Davis, of New York, who at once set about the valuation of the Company's properties. By their report, in April 1921, they placed the valuation at $125,000,000 based, it is claimed, largely on pre-war prices.

Prior to the official valuation made by Ford, Bacon & Davis, the Company, for its own information, employed Mortimer E. Cooley, Dean of the College of Engineering and Architecture of the University of Michigan, to inventory and appraise its properties. This expert, aided by Professor H. C. Anderson, with a force of one hundred and fifty assistants, arrived at a valuation as of May 31, 1921, based on post-war prices, amounting so far as the property alone is concerned to $149,900,000 to which was added 30 per cent. for going value, or $44,900,000, making a total of $194,900,000.

Without reciting all the moves made by the Company and the Board in this protracted controversy, the next important step was the Company's act of filing with the Board a 10 cent rate. The Board declined to allow this rate. The matter went to the Supreme Court, which, on July 1, 1921, 114 Atl. 323 set aside the action of the Board and remanded the proceeding in order that the Board might fix a just and reasonable rate on the evidence. The evidence then before the Board was the newly filed report and valuation of Ford, Bacon & Davis, as well as the valuation of Cooley. Thereupon the Board proceeded to make its own valuation of the Company's properties as a basis on which to grant the Company an increase of fare. It began by making an estimate of the cost of the physical property new. In doing this it excluded "intangibles and everything else except pure physical cost." Physical costs (with the same matters excluded), had been estimated by the experts as follows:

Cooley, cost new, approximately............................$69,000,000
Ford, Bacon & Davis, cost new, approximately.............. 70,000,000
Wolff (expert for municipalities) cost new (historical)............ 72,700,000

The Board valued the property (on a cost new basis) at $70,000,000 reckoned on pre-war prices. From this basic figure it made one deduction and to it three additions, as follows:

Physical cost or value.........................................$70,000,000
Loss depreciation.............................................. 13,500,000

Sub-total ...................................................$56,500,000
Add appreciation.............................................. 12,000,000
Add working capital........................................... 1,500,000
Add going value............................................... 12,000,000

Total ......................................................$82,000,000

With $82,000,000 as its estimate of the present-day value of the Company's properties devoted to the public service, the Board next determined the number of fares which will probably be paid during

the year to be 361,130,000 first fares, 5,300,000 school fares and 75,-000,000 transfer fares.

In determining a just rate on the valuation of the Company's properties, considered with reference to the probable number of fares for the on-coming year, the Board, with the evident purpose of being fair to all concerned, made these findings: That the value of the property of the Company "used and useful in the public service" is $82,000,000; that the operating expenses of the Company, including taxes and depreciation (but taking no account of interest charges, rentals, or dividends on its stock) will not exceed $21,708,000; that the estimated number of fares at the base and transfer rates of 7 cents plus 2 cents, and at the school rates, will yield a gross revenue of $27,550,641; that this sum will cover costs of operation, taxes and depreciation stated above and will give the Company $5,842,500, which, being slightly over 7 per cent. on the property value, the Board regarded as a fair return for its property in public service. It then made its order of July 14, 1921, fixing rates at these figures.

The Company asserting a valuation of its property about double that of the Board and claiming the need of a 10 cent fare to produce a return on that valuation, seeks relief against this last order of the Board by this action. Raising federal questions, it challenges the constitutionality of the statute under which the Board was created (later abandoned) and the constitutionality of the action of the Board in fixing rates, which, it charges, are not commensurate with the service rendered and are, therefore, confiscatory, illegal, and void and in contravention of Section 1 of the Fourteenth Amendment to the Constitution of the United States. The Company prays that it be granted writs of injunction, both temporary and permanent, restraining the Board from interfering with the Company putting into effect the 10 cent rate of fare previously filed and from enforcing against the Company its order of July 14, 1921, fixing a rate of 7 cents plus 2 cents for an initial transfer.

As to the law of the matter under immediate consideration there is not dispute. The highest courts of the State of New Jersey and the Supreme Court of the United States have repeatedly given expression to the same views. Briefly they are these:

The State has a right to control private corporations whose business necessarily monopolistic in character, is affected with a public interest. In the exercise of that control, when, as in this instance, it extends to the fixation of rates, the state, acting through its governmental agency (in this instance the Board of Public Utility Commissioners), must consider both the rights of the public and the rights of the corporation. Out of this situation it must evolve what the law terms a just and reasonable rate, which when made by compulsion of public authority can never exceed the value of the service to the consumer and cannot be made so low as to confiscate the property devoted to that service. Or, as expressed by the Supreme Court of the United States in Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819, the reasonable worth of the service rendered is the maximum of the permissible rate

and a fair return on the value of the property employed for the public convenience is the minimum. It must fall between these two extremes. In applying the test of a minimum, the Courts have held that the rates should be sufficiently high to enable the corporation from its earnings to pay taxes, to meet operating expenses, keep its property unimpaired, induce the investment of money in the business, and make a fair return on the capital invested, Neither the public nor the corporation is entitled to anything more. Public Service Gas Co. v. Public Utility Board, 84 N. J. Law, 463, 87 Atl. 651, L. R. A. 1918A, 421; O'Brien v. Public Utility Board, 92 N. J. Law, 44, 105 Atl. 132; Public Service Railway Co. v. Board of Public Utility (N. J. Sup.) 114 Atl. 323; Philadelphia City Passenger Railway Co. v. Public Service Commission (Pa.) 114 Atl. 642.

While this test, as defined by both state and federal courts, is directed to the value of the corporation's property devoted to public service, the Courts of New Jersey have said in O'Brien v. Public Utility Board, supra, that in fixing a rate it is not necessary that there be evidence before the Board of the value of the property of the public utility where the justice and reasonableness of a rate can be determined without first ascertaining the value of the property. Whether it is the law of New Jersey that the Board may, in every instance, fix rates for a public utility without first valuing its property is a question not pertinent to the issue arising on this application for a preliminary injunction. We are concerned only with what the Board did under the law of the State of New Jersey and with the validity of its action considered with reference to guarantees of the Federal Constitution. Certain it is that the law of New Jersey (Act of 1920) provides for the valuation of the properties of public utilities; that pursuant to that law a valuation of the Company's property was formally made; to that valuation as evidence the Board gave consideration and on it based a valuation of its own from which it evolved the rate in dispute.

[1] In order to show what questions the Court has to decide at this stage of the case, it seems necessary from the drift of the argument first to point out very definitely some of the matters with which the Court, just now, has nothing to do.

By its bill of complaint the Company charges, inter alia, that the action of the Board of July 14, 1921, fixing the rates last named, was unlawful because in contravention of the Fourteenth Amendment to the Constitution of the United States (which forbids a State to "deprive any person of life, liberty, or property, without due process of law"), and prays an injunction, temporary and permanent, restraining the enforcement of that action. When a question of this kind arises, it is the law of the United States (Section 266 of the Judicial Code [Comp. St. § 1243]) that no interlocutory injunction restraining the enforcement of an order made by an administrative board acting pursuant to a statute of a state shall be granted by a District Court of the United States, unless the application for the same be heard and determined by three judges, at least one of whom shall be a Justice of the Supreme Court or (as in this case) a Circuit Judge. Thus it is clear that the

Court as presently constituted has to do solely with a question of allowance or disallowance of a preliminary injunction; the final decision is postponed until after trial. In determining that question the Court has no concern with and therefore will give no consideration to such questions as whether the capitalization of the plaintiff Company is excessive; whether its bonded indebtedness is out of proportion to the value of its property; whether its rental obligations under its leases are greater than the worth of the properties leased; or whether the management of the Company has been good or bad, honest or dishonest. Nor is the Court presently called upon even to inquire whether the 10 cent rate filed by the Company is just and reasonable. The Court is concerned with only one question, which is—whether the rate of 7 cents plus 2 cents for a transfer, last fixed by the Board, is confiscatory of the Company's property because based on a valuation of the property less than its worth at the present time. If it is confiscatory, then the Federal Constitution has been violated and this Federal Court will afford relief.

[2] Before discussing the issue whether the rate in contest is invalid because confiscatory, we shall dispose of the contention of the intervening municipalities that the rate is invalid because higher than rates prescribed by ordinance of municipalities under which, in part, the Company operates its lines. These ordinances contain provisions for 5 cent fares or fares not in excess of 5 cents. Whatever obligation an ordinance locating street railway tracks and prescribing rates of fare may create between a municipality and an utility company, it does not bind the State. Ordinances raising such obligations are enacted, and franchises thereunder are accepted, subject to the reserved power of the State to act on its own behalf in a manner which may in effect nullify them. This power the State of New Jersey exercised by the Act of 1911, and, through the Board there created, it continues to exercise by regulating rates at will. Indeed, in the last of several cases in which this question was involved, the Court of Errors and Appeals of the State of New Jersey said that its previous decisions "foreclose any further discussion relating to the power of the legislature to fix reasonable rates to be charged by a public utility company, notwithstanding the fixing of a maximum rate by a consenting ordinance." O'Brien v. Board of Public Utilities, 92 N. J. Law, 587, 589, 106 Atl. 414. We regard the decisions by the Courts of New Jersey as dispositive of the question of law raised by the intervening municipalities in this case. Collingswood Sewerage Co. v. Collingswood, 91 N. J. Law, 20, 102 Atl. 901, affirmed 92 N. J. Law, 509, 105 Atl. 209; Atlantic Coast Line Electric Ry. Co. v. Public Utility Board, 92 N. J. Law, 168, 104 Atl. 218, 12 A. L. R. 737; Public Service Ry. Co. v. Board of Public Utility Commissioners, 85 N. J. Law, 123, 88 Atl. 818, affirmed 86 N. J. Law, 696, 92 Atl. 1087; Edison Storage Battery Co. v. Public Utility Board, 93 N. J. Law, 301, 108 Atl. 247; O'Brien v. Utility Board, 92 N. J. Law, 587, 106 Atl. 414.

Turning to the issue of confiscation, this court understands that in appraising the value of the Company's properties, all parties agree that

physical cost of the properties may be taken as the base figure. This cost the Board placed at $70,000,000. The intervening municipalities say this figure is too high. The plaintiff Company says it is too low, yet (for the purpose of the present discussion) it admits it to be correct. After giving careful consideration to the contention of the municipalities the Court finds that they have not sustained the burden (which the law places upon them) of overcoming the presumption of correctness which the law gives to the Board's calculation. Therefore, this Court, for present purposes, accepts the Board's costs figure of $70,000,000.

From the physical cost of $70,000,000 (at pre-war prices) the Board deduced the present value (at post-war prices) by making one deduction and three additions. The deduction was $13,500,000 for depreciation.

As the property is no longer new, all agree, of course, that it has depreciated in value. Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371; Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 35 Sup. Ct. 811, 59 L. Ed. 1244. The municipalities contend that the deduction of $13,500,000 is too small. The Company maintains that it should not be charged with depreciation in this sum, or in any other sum, because the depreciation of its property was the fault of the Board in denying it rates sufficient to maintain its property in a state of efficiency.

The next item is $12,000,000 added for appreciation. No one questions that appreciation to property of public utilities is a lawful factor in estimating its value when appreciation has actually occurred. Willcox v. Consolidated Gas Co. 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034; Minnesota Rate Cases, 230 U. S. 458, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18. But the municipalities say that no figure for appreciation should be added to the resultant of the physical cost less depreciation because none exists in the circumstances. The Company urges that while its properties have manifestly depreciated by use since pre-war days, it is equally manifest that their value has appreciated in the great rise of commodity prices which all know took place during the war. The Company maintains that there is a disproportion between the appreciation allowed (about 20 per cent.) and the increase in commodity prices (over 100 per cent.), and that, in consequence, the figure of $12,000,000 allowed for appreciation is grossly unfair. In this connection the Company maintains that the Board failed to give the Ford, Bacon & Davis report the presumptions to which, as evidence, it is entitled by force of the statute and disregarded other evidence in the case.

Passing without contest the item of working capital, the Company next charges error in the Board's figure of $12,000,000 for going value.

All agree that, in the language of the Board's report:

"It is settled law in this State and in the United States that the question of making an allowance for going value is no longer open to discussion. That a going concern has a value over and above the value of the physical property employed is self evident." Des Moines Gas Co. v. Des Moines, 238 U. S. 153,

35 Sup. Ct. 811, 59 L. Ed. 1244; Denver v. Denver Water Co., 246 U. S. 178, 38 Sup. Ct. 278, 62 L. Ed. 649.

But the municipalities say that no item of going value should be allowed because all items validly embraced within such a heading are already included in the base figure of physical cost. The Company contends that the allowance for going value is grossly inadequate, representing that in making an estimate of such value consideration should be given to service and economies of an unitary system over the disadvantages and costs of independent systems individually operated in separate communities. While admitting that such value may include many things very much according to the judgment of the men who appraise them, it urges that it includes the cost of developing the business to its present state of efficiency not returned in earnings, which here is estimated at $1,500,000; losses incident to running new and unprofitable lines; cost of consolidating many separate units and producing the advantages of one comprehensive system with a consequent reduction of fares, extension of transfer systems and increased convenience to the traveling public, estimated by Ford, Bacon & Davis at $5,000,000; obsolescent and superseded property, estimated by the same firm at $4,700,000 and by Wolff, municipal expert, at $9,464,000. In fixing going value the Company asks that consideration be given to cost of obtaining money, testified here to have been between $3,500,-000 and $6,000,000, and maintains finally that the Board in allowing a going value of $12,000,000 gave a value for the system and wholly excluded many of the items specifically given in evidence as going value of the properties, or, if it did not, then it included portions of the specified items and wholly excluded any value for the property as a system.

Instead of an allowance of about 14 per cent. on the physical cost the Company claims 30 per cent., the figure allowed for going value by the Board in Public Service Gas Co. v. Board, 84 N. J. Law, 463, 467, 87 Atl. 651, L. R. A. 1918A, 421.

In addition to its attack upon the items named in the Board's table of calculations, the Company charges that the Board wholly omitted the value of the Company's contract with the Public Service Electric Company, the source of the Railway Company's electric energy, estimated by Ford, Bacon & Davis to be worth a figure between a minimum of $11,194,000, based on pre-war prices, and a maximum of $19,149,000, based on present-day prices.

The Company also contends that the Board ignored the fact that the Railway Company, because of insufficient fares in the past, has been unable to pay the Electric Company for electricity in the sum of $2,-500,000; that the Board rejected as an element of value moneys expended in procuring capital for the work of construction; that the rate established does not make the procuring of new capital possible; that it does not provide for reimbursement for past deficiency in operation; that it does not permit recoupment of unearned profits during the past three years; that the increase of 1 cent per transfer has demonstrated the error of the Board's calculation that it would produce $715,000 annually, in that the test from August 4 to September 6

shows that it produced an increase (over the corresponding period of last year) of $1,227.64 per day, and that at that rate it will produce only $448,088 per annum; that the amount allowed for accident liability is insufficient; and that the amount allowed for taxes is underestimated. For these many reasons the Company charges confiscation of its properties. Some of these reasons we regard as sound, others merely persuasive, and still others without merit. The Board and the municipalities combat all of them.

[3] On this showing the question is, shall a preliminary injunction issue? In reaching a decision on this question we have been guided by several principles. The first is, that except in very clear cases courts should not, and will not, interfere with rate regulation under state statutes. Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034. The next is, that in a question of rate making there is a strong presumption in favor of the conclusions reached by an administrative body after a full hearing. Darnell v. Edwards, 244 U. S. 564, 37 Sup. Ct. 701, 61 L. Ed. 1317. Indeed, one court has gone so far as to say that on an application for a temporary injunction against the enforcement of a rate made by a statutory body every presumption is in favor of the validity of the rate. Kings County Lighting Co. v. Barrett, 276 Fed. 1006, P. U. Rep. N. Y. 1921A, 729.

[4] Without stopping to discuss its precise weight, it is sufficient to say that we have recognized such a presumption and have applied to it the test given in Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034, which is: That to overcome the presumption of the validity of the established rate, the plaintiff Company, praying for a temporary injunction must show "beyond any just or fair doubt" that the action of the Board was "in fact confiscatory." With this test constantly in mind, we have studied and weighed the evidence. Realizing very clearly that we are called upon to exercise a delicate and dangerous power, we have approached the consideration of every point with a keen sense of our responsibility. In our endeavor to administer exact justice we have laid aside all matters urged against the Board's valuation that are open to debate, however persuasive they may appear, and in arriving at our conclusion we have been influenced only by those matters, which, as we view them, have been established by the Company "beyond any just or fair doubt." In estimating these several items we have used the lowest figures in the circumstances. It is not necessary at this stage of the case to discuss the particular matters which have controlled our judgment. It is sufficient to say that we have been constrained to find, first, that the Board either underestimated or wholly excluded from its valuation certain of the Company's properties; second, that the rates names by the Board provide no return for the service of the properties excluded; and third, that the rates fixed are to that extent confiscatory.

[5] On this finding it follows that a temporary injunction must issue. The next question is, what shall be its character? The Com-

pany asks that the injunction shall do two things: First, restrain the Board from interfering with it putting into effect the 10 cent rate previously filed; and second, from enforcing against it the Board's order fixing a rate of fare at 7 cents plus 2 cents for an initial transfer.

As the court is not presently concerned with the lawfulness of the 10 cent rate, no temporary injunction affecting that rate will be awarded. As the court has found against the lawfulness of the rate of 7 cents plus 2 cents, it is clear that the injunction must restrain the enforcement of that rate. But if the court were to do nothing more, the effect of such an injunction would be to annul the rate of 7 cents plus 2 cents, thus re-establishing the previous rate of 7 cents plus 1 cent or leaving established no rate at all. This would be doing injury rather than equity to the complaining party. Anticipating that the court might name a new rate as a condition of an injunction against the old' one, counsel for the Board have quite pertinently called the court's attention to the fact that it is not a rate-making body and have made the point that if the court name a rate as a condition for graning an injunction, it would, in effect, fix a new rate and would thereby exceed its function. That it would exceed its function as a rate-making body is very true, because, not being such a body, it has no such function. But that in so doing it would exceed its power as a court of equity is not true. Injunction is one of the equitable remedies over which the court has jurisdiction. The remedy of injunction may be granted in the terms of the prayer or it may be granted only upon condition that the party seeking equity shall do equity, as in this instance, that the Company shall consent to charge a fare no greater than what the court deems necessary to avoid confiscation. If the naming of a condition is in effect the fixing of a rate, the sanction for the court's act is in the injunction and in the circumstances that make injunction imperative. This rule is ancient and of wide application. Walden v. Bodley, 14 Pet. 156, 164, 10 L. Ed. 398; State R. R. Tax Cases, 92 U. S. 575, 23 L. Ed. 663; Cummings v. National Bank, 101 U. S. 153, 25 L. Ed. 903; People's National Bank v. Marye, 191 U. S. 272, 282–288, 24 Sup. Ct. 68, 48 L. Ed. 180; Amarillo v. Southwestern T. & T. Co., 253 Fed. 638, 165 C. C. A. 264; Toledo v. Toledo R. & L. Co., 259 Fed. 450, 458, 170 C. C. A. 426; Consolidated Gas Co. v. Newton (D. C.) 267 Fed. 231, 273, 274.

To this end the court will award an injunction against the Board of Public Utility Commissioners restraining it temporarily from putting into effect its orders of July 14, 1921, upon the condition, however, that until otherwise directed by the court the Public Service Railway Company shall charge and collect over its various routes a school fare not exceeding the prevailing rate, a base fare not exceeding 8 cents, shall issue and accept as base fares four tickets or tokens for not more than 30 cents and shall charge not more than 1 cent for an initial transfer, and shall give to every rider paying a base fare of 8 cents a receipt for 1 cent, and to every rider purchasing four tickets or tokens for 30 cents a receipt for 2 cents, transferable by hand, and

redeemable by the Company on presentation if the rate named in this condition for injunction is not sustained by the court on final hearing.

Let a decree be prepared.

DAVIS, Circuit Judge (dissenting). This Court has found that:

1. The Board either underestimated or wholly excluded from its valuation certain of the Company's properties.

2. The rates named by the Board provide no return for service of the properties excluded.

3. The rates fixed are to that extent confiscatory.

The history of this case is well told and the questions involved admirably stated in the clear opinion of Judge WOOLLEY. About these there is no contention. The Company complains of the action of the Board in appraising the physical cost of the properties at $70,000,000 (though for the purpose of this application it accepts this valuation); in deducting $13,500,000 for depreciation; in adding only $12,000,000 for appreciation; in allowing only $12,000,000 for going value; in not giving specific instead of potential value to the power contract; in not allowing fares sufficient to enable the Company to pay its debt of $2,500,000 to the Electric Company; in rejecting as part of the cost of reproducing the properties the amount expended in procuring capital required for the work of construction; in not allowing a rate sufficient to enable the Company to procure new capital, to reimburse deficiencies for past operation, to recoup past unearned profits; in estimating the amount 1 cent per transfer would produce and in not allowing a larger amount for accident liability and taxes for the ensuing year. The Court found that the Board underestimated or wholly rejected some of these properties for the reason that if all the properties, which the Company claims were not taken into account in making up the physical cost, be given the lowest value that the experts, Dean Cooley and Ford, Bacon & Davis, placed upon them, they aggregate a larger amount than was allowed for appreciation and going value combined in which alone they could be included, if considered at all.

It would not be profitable to discuss every contention, either of the Company or of the intervening municipalities, concerning the various properties alleged to have been underestimated or wholly excluded. The important contentions relating to appreciation and going value which materially affect the final valuation will illustrate the character of all contentions on both sides of this question and the treatment of them by the Board.

The Board found that the physical cost of the properties in 1915 was $70,000,000, less depreciation of $13,000,000, leaving the actual cost value at that time $56,500,000. The Company admits for the purpose of this application that $70,000,000 is the value of its properties, but strongly urges that no depreciation whatever should be deducted from that valuation. The intervening municipalities accept the valuation of $70,000,000 as correct, but contend that the depreciation was far greater than $13,500,000.

During the war prices advanced generally and the Company strenu-

ously contends that the value of its properties increased at least $43,-000,000. The intervening municipalities urge that, while prices have advanced and properties appreciated, yet these prices are fluctuating and transitory, and so cannot be made the basis of valuation for the purpose of fixing rates. In this contention they were supported by the affidavits of Milo R. Maltbie and Edward W. Bemis, experts of wide reputation and large experience in appraising public utility properties. The Company is entitled to a fair return upon the reasonable value of its properties at the time they are being used for the public convenience. Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819; San Diego Land & Town Co. v. National City, 174 U. S. 739, 19 Sup. Ct. 804, 43 L. Ed. 1154; Stanislaus County v. San Joaquin & Kings River, Canal & Irrigation Co., 192 U. S. 201, 24 Sup. Ct. 241, 48 L. Ed. 406; Lincoln Gas Co. v. Lincoln, 223 U. S. 349, 32 Sup. Ct. 271, 56 L. Ed. 466. But the Supreme Court recognized as an exception to this rule that it would be unfair to the public to base a return on enormously increased values. Willcox v. Consolidated Gas Co. 212 U. S. 19, 52, 29 Sup. Ct. 192, 53 L. Ed. 382, 15 Ann. Cas. 1034, 48 L. R. A. (N. S.) 1134. That Court has not yet been called upon to determine how great an increase must be before it would be unjust to the public to base a rate upon it. but this has been done by other courts and public utility commissions.

Hon. Charles E. Hughes, former Justice of the Supreme Court of the United States and the present Secretary of State, and the writer of the opinion in the Minnesota Rate Cases, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18, was master in 1918 in the case of Brooklyn Borough Gas Company v. Public Service Commission of the State of New York, P. U. R. 1918F, 335, 347, 348, and in that case on an application to increase rates he said:

"To base rates upon a plant valuation simply representing a hypothetical cost of reproduction at a time of abnormally high prices, due to exceptional conditions, would be manifestly unfair to the public. * * * It would be difficult to find any basis more just than the appraisal carefully made by public authority and based on reproduction cost before the outbreak of the European war, with proper consideration of the actual investments since that time."

The Supreme Court of the District of Columbia in an opinion rendered on March 2, 1920, when prices were advancing and six months before they reached their peak, quoted approvingly the opinion of Mr. Justice Hughes in the Brooklyn Borough Gas Company Case, supra, and in speaking of valuation of the capital invested and used for public convenience as the basis of fair and just rates said:

"It [valuation] would lose all value if made as of an abnormal period when prices were abnormally low or high. To be of any assistance or real use, it must be made as of a normal time and the unit cost as applied thereto should extend over a sufficient number of years to show a normal trend of prices. * * * The large utilities whose service and rates are supervised by this commission have not considered it a wise policy to even suggest that considerable accretions be taken into account in arriving at proper rate schedules. * * * It is quite possible that by the time the first case is presented which

embodies in full the controverted question, the need for the decision will, in large part, at least, be gone."

It is evident that the valuation of property used for public convenience must be valued when conditions are normal and prices permanent. This is the only course fair both to public utilities and to the public. In abnormal times, when prices advance, public utilities suffer. In periods of depression, when prices become abnormally low, utility companies have the advantage. In the present year the Public Utility Commission of Illinois, in the case of In re Public Service Company of Northern Illinois, Pub. U. Rep. 1921B, 439, said:

"It would be equally as unfair to the consumer to fix the rate at a figure which would produce a reasonable income on a value determined by the cost of reproduction new at a time when the cost of construction was abnormally inflated, as it would be unfair to the public utility to compel it to serve the public for a rate that would produce a reasonable income on a value determined by the cost of reproduction new at a time when the cost of construction was abnormally low."

Within a month, the Public Service Commission of the State of New York refused to allow the New York State Railways to increase its fare beyond six cents on the ground that—

"It would be grossly unfair to the public to use the extraordinary dislocation in prices due to a world war as the groundwork for the fixation of a proper rate base."

If Mr. Justice Hughes was right in 1918, when prices were increasing by leaps and bounds, in saying:

"It would be difficult to find any basis more just than the appraisal carefully made by public authority and based upon reproduction cost before the outbreak of the European War."

—a fortiori, at this time, when prices have been falling for more than a year, is it unjust to use the appreciated value of the Company's properties of a year, six months or even three months ago, as the basis upon which to fix a fair and just rate of return. The evidence shows, in my judgment, that prices are not yet permanent but transitory. Within a week the following quotations on common material appeared:

|  | To-day. | A Year Ago. |
| --- | --- | --- |
| Wheat | $ 1.17 | $ 2.07½ |
| Corn | .49 | .90¼ |
| Oats | .35¾ | .56¼ |
| Rye | .96 | 1.62¾ |
| Steel billets (open hearth) | 29.00 | 55.00 |
| Sugar | 5.39 | 11.75 |

It was alleged at the hearing, and not denied, that copper is even lower than it was before the war. Unskilled labor is gradually approaching pre-war prices. Skilled labor, however, is trying to maintain war prices, and as a result building operations are comparatively at a standstill. While a general average reduction on all commodities may not be based on these prices, yet it is common knowledge that

they are approximately correct, and indicate that prices generally are in a procession downward, and are not 119 per cent. above pre-war prices, as they were alleged to be in September, 1920. It is unfair to base a return upon transitory prices, either high or low, for the basis of the proposed rate may disappear before it is put into effect. Consequently the Board might have authoritatively said that it would be unfair to the public to base rates upon appreciated valuation due to abnormal war prices but it did not and in its effort to be fair, allowed $12,000,000 appreciation to go into the final valuation for the purpose of fixing a rate of return.

The next large item over which there is a sharp contention between the Company and the intervening municipalities is the amount allowed by the Board for "going value." The Board said:

"It is settled law in this State and in the United States that the question of making an allowance for going value is no longer open to discussion. That a going concern has a value over and above the value of the physical properties employed is self-evident."

The Company contends that going value includes the cost of developing the business to its present efficiency, not returned in earnings; losses incident to running unprofitable lines in rural districts; cost of consolidating many separate lines into a unitary system under one management; the value of obsolescent or superseded properties. The Company declares that—

"Here is a discrepancy evolved out of the minds of the members of the Board of $31,000,000 on this item alone."

The municipalities, on the other hand, contend that while $70,000,-000 represented the pure, physical cost of the properties new, this was a cost of the properties as a going concern, as a unitary system, and not as bare, disconnected, junk value, and that all constituent elements which the Company seeks to have embraced under going value, and which can properly be so embraced, were included in the physical cost. They contend, therefore, that no allowance should have been made for going value and cite the case of Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 35 Sup. Ct. 811, 59 L. Ed. 1244, in which going value was disallowed by the Supreme Court as supporting their contention. There is confusion and uncertainty as to whether some of the elements properly embraced in going value were not included in the physical cost of the properties by the Board. The case is so involved in a mass of contradictory affidavits and evidence that it is impossible to determine, without serious doubts, in this preliminary application just what was included by the Board of physical cost and going concern value. Again the Board sailed between Scylla and Charybdis and allowed $12,000,000 for going value. The Board did not give specific value to the power contract, but did consider its potential value, counsel says, in fixing going value, just as it considered every property in fixing physical cost, appreciation or going value. In making these valuations the Board did not accept fully the opinions of opposing experts, but doubtless considered what all said and used its own judgment.

If, however, some of the properties have been underestimated, or even excluded, when the Board's action as a whole is considered, does its order at this time amount to confiscation within the meaning of the Fourteenth Amendment to the federal Constitution? This court does not mean to increase the return of slightly over 7 per cent. on the properties valued. It does not declare that a return of 7 per cent. is confiscatory. It has sought to provide a return on the properties it has found to be used in serving the public and underestimated or wholly excluded by the Board in its valuation. The Court's order will permit the Company to charge 8 cents for a single fare and 30 cents for 4 tickets or tokens and one cent for a transfer. This is an increase of 1 cent on a single fare and one-half cent on a fare if tickets or tokens are purchased, and a reduction of 1 cent on a transfer. Assuming that riders will generally buy tickets, one-half cent on each of 361,130,000 estimated fares for the ensuing year, exclusive of school fares, which are to remain the same as before, amounts to $1,805,650. If this amount is reduced by $715,000, the amount the Board estimated 1 cent on a transfer would return, the yearly increase in consequence of the court's order will be $1,090,650. The increase as a matter of fact would be greater, because some persons riding only one time would pay a single, flat fare of 8 cents. If, to account for these single fare riders, enough is added to make the aggregate increase $1,400,000, this amount is 7 per cent. on $20,000,000, which must represent the extent of the value of the underestimated or wholly excluded properties. This sum, added to the valuation of $82,000,000, makes a valuation of the properties, according to the Court, as I gather the basis of its conclusion, of $102,000,000. After paying all operating expenses and taxes, the rate allowed by the Board will give a return to the Company of $5,842,500, which is 5.727, or nearly 5¾ per cent. on the increased valuation. After paying all operating expenses, not including taxes, the return would be nearly 7¾ per cent. on the new valuation, without increasing the rate of fare above that allowed by the Board. The Interstate Commerce Commission, composed of men of ability and experience and having at their command an advisory board of noted experts, allows the railroads a return of only 5½ per cent. If the court in this case is right, the Interstate Commerce Commission has confiscated the property of every railroad in the country—a most unlikely assumption. Assuming that the Board did underestimate or wholly exclude the properties to the extent of $20,000,000, in view of the rate of return that the Board's order permits, I should hesitate to say on a preliminary application, without the benefit of a full hearing, with many questions in doubt, that it was confiscatory.

It is apparent that the Company has sought to magnify the valuation of the various constituent elements of its properties and the municipalities, on the other hand, have sought to minimize them. As I have studied this record and weighed the opposing arguments, I have been profoundly impressed with two facts: First, the difficulty of the task which the Board has performed under unusual conditions and trying circumstances; and, second, its earnest effort to make a

valuation of the properties and promulgate a rate of return which would at the same time be fair and just to the Company and to the public. The determination of this question has called for the exercise of the Board's best business judgment, and I am persuaded that with a strong desire to be fair it has conscientiously done its best. Its order is presumptively right and should not be disturbed, unless it clearly appears to be wrong. Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 271; Phœnix Railway Co. v. Geary, et al., 239 U. S. 277, 36 Sup. Ct. 45, 60 L. Ed. 287; Darnell v. Edwards, 244 U. S. 564, 37 Sup. Ct. 701, 61 L. Ed. 1317. As was said in the case of Des Moines Gas Co. v. Des Moines, supra:

"While this case is close to the border line, I cannot say on the whole case that the evidence, beyond any just and fair doubt, satisfied me that the rates (provided in the Board's order) will prove confiscatory."

And I therefore, with regret, am constrained to dissent from the conclusion of my colleagues.